**MULTICARE MEDICAL CENTER, a Washington nonprofit corporation, d/b/a Tacoma General Hospital, et al., Plaintiffs,**

v.

**STATE OF WASHINGTON, et al., Defendants.**

**No. C88–421Z.**

United States District Court, W.D. Washington, at Seattle.

July 3, 1991.

**1356**

David A. Bennett, Bennett & Bigelow, Seattle, Wash., for plaintiffs.

Sara J. Finlay, Atty. General's Office, Social & Health Services, Olympia, Wash., S. William Livingston, Phyllis D. Thompson, Covington & Burling, Washington, D.C., for defendants State of Wash., Dept. of Social and Health Services and Richard Thompson.

Christopher Lee Pickrell, U.S. Attorney's Office, Seattle, Wash., William J. McIntyre, Office of the Gen. Counsel, U.S. Dept. of Health and Human Services, Seattle, Wash., for defendants U.S. Dept. of Health and Human Services and Louis W. Sullivan, M.D.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ZILLY, District Judge.

THIS MATTER came before the Court for trial commencing April 10, 1991. Trial to the Court, sitting without a jury, concluded on May 13, 1991. At the conclusion of trial, the Court took the case under advisement. The Court, having reviewed the testimony presented at trial and the exhibits, having considered the trial briefs and oral argument, and being fully advised, now makes and enters its Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

#### I. INTRODUCTION

1. Plaintiffs Multicare Medical Center d/b/a Tacoma General Hospital; Central Washington Health Services Association d/b/a Central Washington Hospital; Public Hospital District No. 2, Snohomish County, Washington d/b/a Stevens Memorial Hospital; St. Joseph Hospital and Health Care Center; Good Samaritan Hospital; Sisters of Providence in Washington d/b/a Providence Hospital of Everett; Lakewood General Hospital; Sisters of Providence in Washington d/b/a St. Peter Hospital; and Health Resources Northwest d/b/a Northwest Hospital, are not-for-profit corporations or Public Hospital Districts organized and operated under the laws of the State of Washington, and licensed under Chapter 70.41 of the Revised Code of Washington ("RCW"), as acute care hospitals providing inpatient services. Plaintiff Legacy Health System does business as Emanuel Hospital and Health Center ("Emanuel Hospital") and is a not-for-profit corporation organized and operating under the laws of the State of Oregon. Emanuel Hospital is located in Portland, Oregon, where it operates as an acute care hospital providing inpatient services to residents of Oregon and Washington.

2. State defendants are the State of Washington, Department of Social and Health Services ("DSHS"), and Richard Thompson, the Secretary of DSHS (collectively, the "State").

3. Federal defendants are the United States of America, Department of Health and Human Services ("HHS"), and Louis Sullivan, M.D., Secretary of HHS (collectively, the "federal defendants").

4. The State of Washington participates in the federal Medicaid program established by the Medicaid Act, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396q. Defendant DSHS, under the direction of Richard Thompson, is the state

agency responsible for administering the Medicaid program in the State of Washington. Defendant HHS is the federal agency charged with administering the federal Medicaid program and has delegated much of this responsibility to the federal Health Care Financing Administration ("HCFA").

5. Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, alleging that State defendants deprived them of their rights secured under the Medicaid Act. Plaintiffs challenge the State of Washington's new second generation Diagnosis Related Groups (DRG) based reimbursement system for inpatient hospital services for Medicaid recipients which became effective April 1, 1988. Plaintiffs specifically challenge the State's compliance with the reimbursement standards set forth in 42 U.S.C. § 1396a(a)(13)(A). Plaintiffs' action against the federal defendants challenges HCFA's conduct under 5 U.S.C. § 702 as being arbitrary and capricious and otherwise not in accordance with law.

■ 6. The Medicaid Act is a cooperative federal-state program designed to provide medical services to certain low-income persons. Participation by the State of Washington is voluntary. However, once the State makes the decision to participate in the program, it must comply with the federal Medicaid laws and regulations. *Amisub, (PSL), Inc. v. Colorado Dept. of Social Services*, 879 F.2d 789, 794 (10th Cir.1989), *cert. denied*, — U.S. ——, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990); *Mississippi Hospital Ass'n. v. Heckler*, 701 F.2d 511, 515 (5th Cir.1983).

7. The Medicaid Act requires each State to submit its Medicaid plan to the federal government, specifically HCFA, for approval. 42 U.S.C. § 1396. In 1981, Congress amended section 1396a(a)(13)(A) (the "Boren Amendment") to require each State to "find" and make "assurances" satisfactory to HCFA that its inpatient hospital rates: (1) are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards" (the "economy and efficiency requirement"); (2) are reasonable and adequate "to assure that individuals eligible for medical assistance have reasonable access (taking into account geographic location and reasonable travel time) to inpatient hospital services of adequate quality" (the "access requirement"); and (3) take into account "the situation of hospitals which serve a disproportionate number of low income patients with special needs" (the "disproportionate share requirement").

8. In implementing the Boren Amendment, HCFA promulgated regulations requiring state Medicaid agencies to obtain HCFA approval of any State plan change in payment methods and standards. 42 C.F.R. § 447.253. In order to receive HCFA approval, the State must submit "assurances" satisfactory to HCFA that the requirements of federal law are being met. Whenever the State makes a change in its methods and standards, but not less often than annually, the State is required to make findings and assurances, satisfactory to HCFA, that the rates satisfy all requirements of federal law.

9. To make changes in its State Plan's methods and standards, DSHS submits plan amendments using Transmittal Number ("TN") designations. Under HCFA regulations, DSHS can, with proper public notice, implement a change in methods and standards without transmitting the state plan amendment and the required assurances, provided the Transmittal is dated before the end of the quarter in which implementation occurred. 42 C.F.R. § 447.256(c).

10. The Division of Medical Assistance is the division within DSHS which is directly responsible for administering the state's Medical Assistance programs, including the Medicaid program and the state-only funded Medically Indigent and General Assistance–Unemployable programs (collectively, "MI/GAU"). At all times material hereto, the director of the Division of Medical Assistance was Ron Kero. The Rates Analysis Unit of the Division of Medical Assistance is responsible for developing and implementing medical assistance programs,

including Medicaid. Prior to early 1989, Roger Gantz was the Manager of the Rates Analysis Unit. Since early 1989, Thomas Johnson has been the Manager of the Rates Analysis Unit.

11. The plaintiffs claim that DSHS violated the procedural and substantive requirements of the Boren Amendment with respect to the economy and efficiency requirement, the access requirement, and the disproportionate share requirement.

## II. ROLE OF THE WASHINGTON STATE HOSPITAL COMMISSION

12. From 1973 until 1989 the hospital industry in Washington State was regulated by the Washington State Hospital Commission ("Hospital Commission"), a state agency which established rates that hospitals could charge for health care services.[1] From 1984 until its sunset in 1989, the Washington State Hospital Commission was comprised of nine members, one of whom was the Secretary of DSHS, or his or her designee, for the purpose of "representing the interests of the state as a major purchaser of health care services." RCW 70.39.030(1)(g).

13. The Hospital Commission was charged with ensuring that hospital costs did not exceed those "necessary for prudently and reasonably managed hospitals." RCW 70.39.140. The Hospital Commission required submission of an annual budget with budgeted volumes and expenses. To assist it in analyzing and ruling upon hospital budget requests, the Hospital Commission engaged a professional staff of employees. The staff had knowledge of and expertise in hospital cost analysis.

14. The Hospital Commission regulated Washington hospitals' budgetary processes. It established by regulation an accounting and reporting manual ("the Manual") containing a detailed uniform system of hospital cost accounting and reporting.

WAC 261–20–020. Annually, each hospital filed a detailed report with the Hospital Commission pursuant to the Manual, which required expenses to be broken down into nine natural classifications. The Hospital Commission required hospitals to submit detailed cost reports each year. Pursuant to statutory requirements, the Hospital Commission held public hearings on, among other things, each hospital's operating expenses, capital allowance, and deductions from revenue. The sum of these three components became the hospital's total rate setting revenue. Revenue was not allowed for cost items disapproved by the Hospital Commission. The staff made recommendations to the Hospital Commission as to whether or not budgeted expenses, capital allowance and deductions from revenue met the statutory criteria applicable to the Hospital Commission set forth in Revised Code of Washington, Chapter 70.39, and the regulatory criteria set forth in the Washington Administrative Code at Chapter 261–40.

15. The Hospital Commission annually published and distributed to hospitals extensive cost and productivity data that compared hospitals to other hospitals in groupings called peer groups. The Hospital Commission classified Washington hospitals into four peer groups. Peer group A hospitals were essential rural hospitals, peer group B hospitals were non-essential rural and non-teaching urban hospitals, peer group C hospitals were teaching hospitals, and peer group D hospitals were hard-to-classify, specialty hospitals. The Hospital Commission used the peer groups to establish a percentile to trigger further budget review. The Hospital Commission presumed that hospitals with operating expenses below the 70th percentile in each peer group had reasonable operating expenses. Hospitals with operating expenses at or above the 70th percentile in each peer

1. Plaintiffs previously moved to have this Court hold as a matter of law that Hospital Commission rate determinations collaterally estop the State from relitigating the reasonableness and necessity of Hospital Commission-approved costs and the efficiency and economy of Washington hospitals. The Court, following oral argument, denied the plaintiffs' motion. Notwithstanding that ruling, because the State defendants relied on Hospital Commission data and peer groupings in connection with its new plan, an understanding of the role of the Hospital Commission is necessary.

group were subject to further budget review.

16. In addition to approving costs and revenues for the budget year, the Hospital Commission also utilized a year-end conformance review to insure that hospitals' actual performance conformed with the revenue and cost projections approved in the prior year. Each hospital was required to file a "year-end conformance report" containing the following: its Medicare cost report filed with Medicare, a financial statement including a statement of income and expenses audited by a public accounting firm, and a year-end report of expenses incurred and revenue received during the year. RCW 70.39.110; WAC 262-40-150(6). The Hospital Commission staff conducted a desk-audit, comparing the year-end conformance report with the Medicare cost report and the audited financial statements. A hospital was deemed out of conformance if its actual revenue exceeded the approved revenue adjusted for actual patient volumes. Hospitals could justify excess revenue, but all justifications had to be related to unanticipated and justifiable increases in operating expenses. WAC 261-40-150(6)(f). If the Hospital Commission refused to accept the justifications, a Decision and Order was issued ("year-end Conformance Adjustment"), reducing the hospital's current year budget and rates by the amount that actual revenue exceeded approved revenue.

17. Because the Legislature took no action to reauthorize the Hospital Commission's authority by June 30, 1989, the Commission's rate-regulation authority sunset as of June 30, 1989 pursuant to RCW 43.-131.253. Although the Hospital Commission's authority ended, its data collection function survived and was transferred to the newly created Washington State Department of Health ("DOH") as of July 1, 1989 and continues to this day. DOH requires hospitals to continue preparing and submitting certain financial information such as budgets and budget amendments, year-end reports, quarterly reports, and changes in hospital prices.

## III. THE WASHINGTON MEDICAID REIMBURSEMENT SYSTEM

18. Prior to January 1, 1985, hospitals were paid for inpatient services to Medicaid patients on a retrospective basis. In 1983 and 1984, for example, payment rates were established by multiplying a hospital's allowable billed charges by the ratio of Hospital Commission-approved operating expenses to Hospital Commission-approved total rate setting revenue (the "OE/TRSR" ratio).

19. Effective January 1, 1985, DSHS adopted its first truly prospective methodology for reimbursing inpatient hospital services. The new system, described in TN 85-15, used Diagnosis Related Groupings ("DRGs") to pay hospitals prospectively-determined rates based on a Medicaid patient's diagnosis. This system became known as the "first generation DRG system." The first generation DRG system classified illnesses according to 486 different diagnoses and procedures, and assigned each a relative weight, designed to reflect relative resource consumption. Payments for Medicaid patients under the first generation DRG system were calculated by multiplying a DRG's relative weight by a hospital-specific base rate, called a conversion factor.

20. Under the first generation DRG system, each hospital had a different payment rate, representing the hospital's average cost per Medicaid patient. To calculate each hospital's payment rate, DSHS first determined its 1982 costs, using the hospital's 1982 Medicare cost reports. DSHS then divided the hospital's 1982 base year costs into three components: operating costs, capital costs, and teaching costs. The hospitals' 1982 base year component costs were then inflated to payment year levels. Teaching and capital costs were inflated annually based on increases for such costs approved during the Hospital Commission's annual rate setting procedure. Operating costs were inflated annually using the DRI Hospital Market Basket Index.

21. Effective February 1, 1986, DSHS filed plan amendment TN 86-7, reducing

payments to hospitals under the first generation DRG system by 23.7 percent across the board. On May 18, 1987, Judge Carolyn Dimmick declared State plan amendment TN 86–7 void, and found that the hospitals were entitled to payment at the full rates provided for in TN 85–15, the approved State plan in effect prior to the reduction. *Washington State Hospital Association v. Washington*, No. C86–463D, Slip op., 1987 WL 88997 (W.D.Wash., May 18, 1987), *reprinted in* Medicare & Medicaid Guide (CCH), ¶ 36,352 (1987).

22. Soon after Judge Dimmick invalidated TN 86–7, DSHS adopted TN 87–15. TN 87–15 made one significant change to the first generation DRG system: it substituted the Medicare Prospective Payment Update Factor ("MPPUF") for the DRI Hospital Market Basket Index as the inflation factor used to inflate 1982 base year operating expenses. Except for this one change, the first generation DRG system remained in place until April 1, 1988, when the State replaced it with TN 88–8.

23. TN 88–8 implemented a new second generation DRG system which was the subject matter of this trial. While structurally similar to the first generation system, TN 88–8 made several significant changes to the rate setting methodology which resulted in a substantial reduction in overall Medicaid payments to hospitals. The various components of the second generation DRG system have been the focus of this litigation and are described in detail below.

24. The State's new second generation Diagnosis Related Groups (DRG) based reimbursement system employs three methods to determine hospital payment rates. These methods are (1) DRG cost-based rates, (2) DRG selective contract rates, and (3) rates based on a hospital's ratio of operating expenses to total rate setting revenue (OE/TRSR). The State's selective contracting program is not part of the State Medicaid plan and is exempt from Boren Amendment requirements pursuant to a

waiver from HCFA. Contracting hospitals participating in the State's selective contracting program are paid in accordance with their contract price. Hospitals not located in selective contracting areas or otherwise exempt are reimbursed on a cost-based DRG rate. Non-contracting hospitals in selective contracting areas are paid on a cost-based DRG rate, but are restricted to treating emergency Medicaid cases only.

## IV. THE PLAINTIFFS' CHALLENGE TO THE STATE'S CURRENT SYSTEM

### A. *Scope of Trial*

25. Although plaintiffs' complaint challenges various State plans and amendments instituted since January 1, 1985, the Court limited the instant trial to the State's second generation reimbursement system, described in TN 88–8 (the "second generation DRG payment system"), and subsequent plan amendments (collectively, the "State Plan").[2] TN 88–8, implemented on April 1, 1988, was submitted with the State's assurances and related information to HCFA for approval on June 29, 1988, and eventually approved by HCFA on July 16, 1990. Subsequent to the implementation of TN 88–8, the DSHS submitted to HCFA three plan amendments: (1) TN 88–11, effective July 1, 1988, which increased reimbursement to hospitals serving a disproportionate share of low income patients; (2) TN 89–14, effective July 1, 1989, which increased reimbursement to hospitals for certain psychiatric and AIDS cases; and (3) TN 89–17, effective October 1, 1989, which provided reimbursement for services to chemically dependent pregnant women. These amendments did not alter the basic rate setting methodology established in TN 88–8.

26. The Court limited its review at trial to TN 88–8 and its amendments in

---

**2.** The trial was limited to a determination of whether the State defendants' adoption of TN 88–8 and its amendments was procedurally and substantively in compliance with federal law. The court reserved for later trial issues relating

to earlier plans and whether or not the federal defendant's conduct in approving TN 88–8 was arbitrary and capricious or otherwise contrary to law.

order to comply with the Eleventh Amendment of the United States Constitution. While a federal court may award injunctive relief requiring state officials to conform their conduct to federal law, the Eleventh Amendment stands as a bar to claims against a State in federal court for money damages or other retrospective relief. *Edelman v. Jordan,* 415 U.S. 651, 666–67, 94 S.Ct. 1347, 1357–58, 39 L.Ed.2d 662 (1974). Moreover, a federal court may not issue a declaratory judgment that federal officials violated federal law in the past where there is no ongoing violation of federal law. *Green v. Mansour,* 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985). In the present case, there would be no continuing violation of federal law to enjoin if the current state plan was held valid.

27. On February 28, 1991, this Court issued a temporary injunction, enjoining the State from implementing a new state plan which was scheduled to go into effect on March 1, 1991. The Court enjoined the implementation of the new plan in part to preserve the plaintiffs right to challenge the current DRG reimbursement plan. The injunction shall remain in effect until final judgment is entered or until further order of this Court.

### B. *DRG Payment Rates*

28. A DRG (diagnosis related groups) system provides for payment to hospitals of prospectively-determined rates based on a Medicaid patient's diagnosis related group. A DRG system is a patient classification system which classifies patients into groups based on diagnoses, the presence of surgical procedures, patient age, presence or absence of significant comorbidities or complications, and other relevant criteria. The DRGs categorize patients into clinically coherent and homogeneous groups with respect to resource use. The Washington Medicaid program currently uses 467 of 475 DRGs as classified by Grouper Version 5. Eight DRGs are not used because they represent exempt neonatal services, services no longer valid, or invalid or ungroupable cases. (Ex. 439, pp. 41–42). Under a DRG reimbursement system, a hospital is reimbursed a fixed amount based upon the diagnosis grouping into which a patient's condition falls. The fixed amount is derived from hospitals' historical costs incurred in treating patients in that DRG classification and generally does not vary, regardless of the patient's length of stay in the hospital or the actual charges that are billed on account of that stay. The fixed amount or DRG rate for each hospital is multiplied by a relative weight assigned to each DRG, in order to determine the actual payment amount for an inpatient admission. For example, to determine how much payment plaintiff Central Washington Hospital should receive for performing a skin graft (DRG 264), DSHS multiplies Central Washington's base payment rate of $1,569 by the relative weight of DRG 264, which is 2.2677, for a total payment of $3,558.02.

### (1) Calculation of DRG Payment Rates under the Second Generation DRG System

29. Under the second generation DRG payment system, the DRG payment rate is a hospital specific dollar amount which is multiplied by the applicable DRG weight to produce the DRG payment. The rate is established on the basis of a hospital's average cost for treating a Medicaid patient during a base year period. For TN 88–8 and its amendments, the State selected 1985 as the "base year." The base year rate is adjusted for the hospital's case mix and, with the exception of capital-related costs, updated for inflation to the current payment year. The first payment year under the new plan commenced April 1, 1988.

The specific calculations were made as follows:

(a) DSHS determined fiscal year 1985 base year costs per admission for each hospital using audited Medicare cost reports, also known as HCFA Form 2552 reports. DSHS excluded from base year costs the costs of patients exempt from DRG reimbursement ("non-DRG patients"), such as rehabilitation, burn and neonate patients. Base year costs per admission were then divided into components consisting of operating expenses, capital costs (depreciation, interest and leases), and medical

education costs. The three component costs per admission were then standardized by application of a Medicaid case-mix index.[3]

(b) The hospitals were then segregated into four peer groups that were developed and used by the Hospital Commission for budget review purposes. Peer Group A consists of essential rural hospitals, Peer Group C contains teaching hospitals, Peer Group D has specialty hospitals and Peer Group B contains all remaining hospitals. All Washington hospitals are divided into these four peer groups as shown by Exhibit 439. The standardized component costs for the hospitals in each peer group were then arrayed from lowest to highest so that peer group median component costs could be identified. DSHS used the median (50th percentile) Medicaid cost per admission for each component in peer groups A, B and C to limit or cap component costs. Peer group D, which consists of certain hard-to-classify specialty hospitals, was not subject to any peer group capping. If a peer group A, B or C hospital's component cost was below the median, that component cost was not capped. The result was that each peer group A, B or C hospital's allowable component cost was the lower of its own cost or the median cap.

(c) The "capped" or, if below the median, actual operating and medical education component costs were then added together and inflated by the Medicare Prospective Payment Update Factor ("MPPUF") from the 1985 base year to the current payment year. The 1985 "capped" capital cost component (depreciation, interest and leases), without any inflation, was then added to this amount to arrive at the base payment rate for the current year. For purposes of determining the payment amount for an inpatient admission, a hospital's base payment rate is multiplied by the relative weight associated with the DRG into which an admission falls.

3. The term "case-mix" refers to the average relative weight of the cases that a hospital treats. Use of a case-mix index to standardize costs (by dividing each hospital's average cost per admis-

C. *OE/TRSR Payment Rates*

30. Under TN 88–8 and its plan amendments, certain hospitals and services are exempt from the DRG payment method. Exempt hospitals include psychiatric hospitals, rehabilitation units, alcoholism treatment centers, pain treatment centers, managed health care, out-of-state hospitals, and military hospitals. Exempt services include neonatal services, rehabilitation cases, and AIDS-related services. Such hospitals and services are reimbursed under the "OE/TRSR method." Under the OE/TRSR method, the basic payment is calculated by multiplying the hospital's assigned OE/TRSR ratio by the allowed charges for medically necessary services. The OE/TRSR ratio, an acronym for the ratio of operating expenses to total rate setting revenue, is a ratio of cost to charges derived from using the Hospital Commission's categories of operating expenses and total rate setting revenue. Recipient responsibility or third party liability payments are deducted from the basic payment to determine the actual payment for an admission. There is no inflation factor applied to payments made under the OE/TRSR ratio.

31. The State also uses the OE/TRSR ratio in reimbursing extraordinarily expensive cases known as "outliers." Under the State Plan, if the charges for a DRG case exceed a threshold of three times the DRG payment amount or $14,000, whichever is higher, the amount above that threshold generally is reimbursed at the level of 60 percent of reasonable cost, as estimated using the OE/TRSR ratio. Total payment in such cases equals the DRG rate plus a percentage of charges exceeding the outlier threshold amount. Cases that fall below the outlier threshold amount are reimbursed solely by the DRG rate.

D. *Selective Contract Rates*

32. At the same time that it implemented the second generation DRG system in TN 88–8, the State also implemented a hos-

sion by the hospital's case-mix) allows the State to control for differences among hospital case loads.

pital "selective contracting" program. Under the selective contracting program, Medicaid services in certain selective contracting areas are provided primarily by hospitals that have entered into Medicaid contracts with the State. As of April 1, 1988, there were six selective contracting areas including Seattle, South King County, Spokane, Tri–Cities, Vancouver/Portland, and Yakima. Hospitals that are not in selective contracting areas ("noncontracting hospitals"), are paid pursuant to the formula rates determined under the second generation DRG system. None of the plaintiff hospitals have entered into selective contracts with the State. Where hospitals are located in a selective contracting area but do not enter into contracts with the State, they are limited, for the most part, to providing emergency services to Medicaid recipients. As of March 1, 1991, there were 24 Washington hospitals that had entered into selective contracts with the State. These hospitals perform approximately 43 percent of all Medicaid services in the State. The selective contracting hospitals and their contract rates for the period April 1, 1988 through March 1, 1991 are shown on Exhibit A–137 A.

33. To implement the selective contracting program, DSHS had to obtain from HCFA a waiver of the Boren Amendment and had to demonstrate to HCFA that the program was cost effective by showing that the selective contract prices in any given area were, in the aggregate, equal to or less than the formula prices that would be paid under the second generation DRG payment system in TN 88–8. The plaintiffs do not challenge the validity of the State's selective contracting program.

## V. FACTORS LEADING TO ADOPTION OF SECOND GENERATION DRG SYSTEM

### A. *The Role Played By Budgetary Constraints in DSHS's Development of the Second Generation DRG System*

34. DSHS's decision to design a new Medicaid reimbursement system was based in substantial part on the need to address an unexpected State budget shortfall for the 1987–89 biennium, which became apparent in December of 1986. DSHS knew in the last week of December that the Governor had cut DSHS's Medicaid appropriation request to the State Legislature by $25.8 million ($14 million of State funds).[4] DSHS informed the State Comptroller on January 15, 1987, that the Governor's reduction in appropriations presented a "formidable task" to effect "a reduction of that magnitude from an already low level," and that "the earliest possible implementation date for any new reimbursement methodology would be January 1, 1988." (Ex. 44). DSHS knew that, to counter the effect of the Governor's reduction in DSHS's appropriation level, DRG rates for Medicaid cases would have to decrease 7.4 percent, effective July 1, 1987. DSHS concluded that the budget decreases would "necessitate a new hospital reimbursement system." (Ex. 69). Ron Kero admitted in his testimony that the new system was required because the then available funding was known and fixed.

35. In early 1987, Kero made the decision to develop a new reimbursement system. DSHS contacted consultants from the Compass Consulting Group of Peat Marwick Main & Co. ("Peat Marwick"), who had experience in designing Medicaid prospective payment systems.

36. The second-generation DRG payment system was developed by the State with the assistance of Peat Marwick, over a period of approximately one year. Peat Marwick reported to the State in a series of documents called "Deliverables."

37. Ron Kero devised a point-ranking system which was used "by and large" to make the decisions that led to adoption of the new reimbursement system and its elements. This ranking system was based on 100 points, of which 55 points were assigned to categories dealing with the impending budget shortfall: 50 points for

---

4. The Medicaid program is jointly financed and administered by the State and the federal government. The federal government pays a share of the State's total Medicaid expenditures.

"Option Achieves Necessary Savings" and 5 points for "Expenditures Are Predictable." (Ex. 62). Fifteen points were assigned to providing access and quality of care. Ten points each were attributed to (1) simple administration, (2) management flexibility, and (3) equitable treatment of hospitals. Ron Kero's handwritten notes on Exhibit 71 demonstrate that the system was designed based on DSHS' knowledge that the appropriation did not provide as much money as it would like to pay hospitals and the need to decrease aggregate reimbursements based on a funding level that was known and fixed. In May 1987, DSHS's budgetary constraints became more acute when Judge Dimmick invalidated the 23.7 percent across-the-board reduction in first generation DRG payment rates that DSHS had imposed in TN 86–7.

38. As of July, 1987, DSHS's best estimate was that it would have to cut hospital Medicaid inpatient rates by 9.4 percent as of January 1, 1988. DSHS concluded that if the rate reduction was implemented after January 1, 1988, the reduction would have to be greater than 9.4 percent.

39. Handwritten notes of Roger Gantz, the DSHS official responsible for the development of TN 88–8, refer to the need for "inpatient rate reductions to meet both inpatient and outpatient target levels," with target levels referring to the amount of the 1987–89 biennium appropriation. (Ex. 56, p. 40).

40. The ability to increase budget savings by picking and choosing the formula price elements was a theme that continued throughout development of the second generation DRG system. In October of 1987, DSHS provided Peat Marwick with appropriation levels for use in assessing the impact on state budget targets of the formula elements chosen to that date. DSHS informed Peat Marwick that to meet the appropriation level, hospital Medicaid inpatient rates had to be reduced by 11.6 percent effective January 1, 1988. (Ex. 953). This became the final "budget target."

41. On November 12, 1987, Peat Marwick performed a budget impact analysis, Exhibit 57, showing that the formula elements chosen to that date produced reimbursement rates that were $11,948,276 *above* the budget target for the biennium.

42. As a result, DSHS made a number of policy decisions after November 12, 1987, to decrease the amount of state funds that would be required by the new system. These decisions included changes in outlier policies and changes in the OE/TRSR ratio between the first-generation and the second-generation system. DSHS's decision to exclude outlier cases, the most expensive cases in the Medicaid system, from the calculation of the base year costs reduced rates by over 4 percent. (Ex. 35, p. 1).

43. A "Policy Impact Analysis" dated January 25, 1988, Exhibit 60, shows that the reimbursement system had, by that time, met the exact budget target of achieving an 11.6 percent reduction in payments.

44. During the period early 1987 through the adoption of the second generation DRG system in April 1988, the State expended thousands of hours in the design and implementation of the new program. This was the largest study and investigation ever undertaken by DSHS. The State also used the services of Peat Marwick who had substantial experience in the Medicaid reimbursement area. Peat Marwick prepared dozens of reports for the State setting forth available policy options and documenting the design for the system. DSHS also solicited and received input from the hospital industry. However, the Court finds that the driving force behind the decision to develop a new system and the policy decisions relating to the new system was the State's desire to meet budgetary targets. Ultimately, the State selected various rate components and made certain policy decisions in order to achieve the desired reduction in payments from an "already low level" to an even lower level reflecting an additional reduction in Medicaid benefits of over eleven million dollars ($11,000,000) per year. (Ex. 60).

## VI. COMPONENTS OF THE SECOND GENERATION DRG SYSTEM

45. The plaintiffs claim that the key methodological features of the second gen-

eration DRG payment rate, namely, the Hospital Commission peer groups, median capping of component costs, the selected inflation rate (MPPUF), and the capital freeze, were selected solely to meet the budget target, without a bona fide and objective investigation and due consideration of all relevant facts. Much of the evidence at trial focused on aspects of these specific components and, therefore, it is appropriate to describe each one in more detail.

## A. *The Peer Groups*

46. The second-generation DRG system uses the peer groups formerly used by the Hospital Commission. The Hospital Commission, as part of its budget review process, grouped hospitals into four peer groups in order to compare hospitals' costs and charges. The first group, peer group A, is comprised of 32 essential rural hospitals, that is, those hospitals in rural areas whose continued operations are essential to the public interest. Peer group C contains 12 teaching hospitals, which are expected to have higher costs than non-teaching hospitals. Peer group D consists of hospitals thought to be difficult to classify or incomparable to others in their cost and budget structures. Peer group D includes a total of five (5) children's and other highly specialized facilities. The last group, peer group B, consists of all hospitals that do not meet the criteria established for the other three peer groups. There are 50 hospitals in this peer group. Most of these hospitals are urban non-teaching and non-essential rural hospitals. During the Hospital Commission's tenure, hospitals were free to request placement in a different peer group. As of September 1987, three hospitals had successfully challenged their classification and were moved to another peer group by the Hospital Commission. (Ex. 68). No appeal process was provided under the new State Plan to allow hospitals to challenge peer group classification and no hospital has attempted to challenge their peer group designation under the new Plan.

47. One of the tasks Peat Marwick was hired to perform in connection with the formulation of a new reimbursement system was the development of hospital peer group classifications. DSHS intended that the peer groups would be used to establish "efficiency caps" for determining conversion factor components. (Ex. 27). On August 17, 1987, Roger Gantz informed Ron Kero that there appeared to be a general consensus among Peat Marwick representatives that the Hospital Commission peer groupings were inadequate and "a 'weak' system which may have to be defended in court." (Ex. 27). Peat Marwick presented DSHS with a series of options, including a proposal that DSHS commission a study to develop a Medicaid specific peer group system. Peat Marwick estimated that a study of this type would take six months to one year to develop and implement. Ron Kero rejected this option, explaining that there was "no time" to undertake such an endeavor.

48. In a subsequent report dated September 28, 1987, Peat Marwick identified again the methodological deficiencies of the Hospital Commission peer groupings, but ultimately recommended that DSHS adopt the Hospital Commission peer groups for use in setting caps for the formula pricing system. Peat Marwick concluded that "while the peer groups may have a number of methodological deficiencies, they are recognized by the State and the hospitals as the official peer groups currently in use." (Ex. 68).

49. DSHS adopted the Hospital Commission's peer groups as the basis for the second generation DRG payment system's relative definition of efficiency. DSHS did not conduct any independent investigation or study of the Hospital Commission peer groups to determine whether they were a proper basis for capping costs.

50. DSHS and the Hospital Commission used the peer groups for different purposes and achieved vastly different results. The Hospital Commission used the peer groups to make comparative analyses and to establish a percentile, the 70th percentile, to trigger further budget review. The Hospital Commission did not use the peer groups to set or limit payment rates. In

contrast, DSHS used the peer groups to set the payment rates for hospitals. Specifically, DSHS used the peer groups to cap the hospitals' component costs at 1985 peer group medians. The impact of any methodological deficiencies in the peer groupings was not as significant to hospitals in the context of budget review as they were in DSHS's rate setting process. The consequence of a hospital's falling above the 70th percentile in the Hospital Commission's budget review process was merely exposure to further budget review. Hospitals with high operating expenses relative to their "peers" were given the opportunity to justify their anticipated expenses and have such expenses approved. This was not true with respect to DSHS's rate setting process. Component costs above the median were presumed to be excessive and inefficient and were disallowed. The State did not consider, and hospitals were not given an opportunity to identify, special factors or circumstances which set them apart from others in the peer group or which made their placement in a particular peer group inappropriate.

51. In October of 1988, after TN 88–8 was adopted, the Hospital Commission conducted a study of its peer grouping system and considered whether the Commission should revise peer groups A, B, and C.[5] (Ex. A–489). The Hospital Commission concluded that the peer groups should be retained, explaining that none of the other alternative peer groups considered could be shown to be the "best," and that hospitals were relatively comfortable with their peer group placements. (Ex. A–489). DSHS subsequently relied upon this Hospital Commission report as support for its later findings that use of the Hospital Commission peer groups to establish "efficiency caps" was reasonable.

### B. *Use of Median (50th percentile) Caps*

52. Peat Marwick explained the cap to be used in each peer group as setting "a level which defines the cost to an economic and efficient hospital of providing care to Medicaid recipients." (Ex. 28, p. 4).

53. DSHS chose to cap hospitals' 1985 base year costs at the median of each peer group, except Group D, for each of the three cost components.

54. DSHS witnesses testified that the median was selected because HCFA had approved this standard in other states and courts had accepted it as a standard of relative efficiency. DSHS made no attempt to ascertain the validity of DSHS's peer grouping methodology relative to the peer grouping methodology used in these other states. DSHS did not investigate whether costs disallowed by adoption of the median cap were due to inefficiency or lack of economy.

55. DSHS witnesses testified that they knew of no other state that had ever applied peer group caps on a component basis and could not identify a judicial decision that approved peer group capping by component parts rather than in the aggregate.

56. Capping by components results in 64 percent of the hospitals in Washington having their base year costs capped. For peer group A hospitals, the capping resulted in an average reduction in the base payment rate of $93.76. For peer group B and C hospitals, the reductions were $126.37 and $99.85, respectively. (Ex. 20). Several of the plaintiff hospitals experienced a significant decrease in payments as a result of the capping. For St. Peter Hospital, a peer group B hospital, capping resulted in a reduction in its base payment rate of $383.48. Tacoma General, a peer group C hospital, experienced a reduction in its base payment rate of $183.70.

57. DSHS did not examine the appropriateness of using the median to cap component costs for each peer group of Washington hospitals. When it adopted the median caps, DSHS did not know that the Hospital Commission had gone from the median to the 70th percentile for its budget screens. DSHS conducted no investigation and performed no cost analysis to determine whether Commission-approved base year

---

5. The Commission excluded from its study peer group D, which it called "unclassified" hospitals.

costs above the 50th percentile were costs that an economic and efficient hospital must incur.

### C. *Use of the MPPUF as the Inflation Factor*

58. DSHS first adopted the MPPUF as its inflation factor in TN 87–15, effective July 1, 1987, which amended the State's first generation DRG system. In TN 87–15, DSHS substituted MPPUF for the DRI Market Basket Index as the inflation factor for that reimbursement system.

59. The DRI Market Basket Index (published by HCFA in the Federal Register) is a national measure of the increase in input prices for a standard "market basket" of goods and services typically purchased by hospitals. Thomas Johnson of the DSHS admitted that the DRI Market Basket is the best available and most common estimator of inpatient hospital costs.

60. MPPUF is the update factor developed annually and adopted by Congress to update payment rates in the Medicare prospective payment system. Medicare is the largest payor in the State of Washington, paying 35 to 40 percent of hospital revenues. Medicare has no requirement such as the Boren Amendment that it pay costs that must be incurred by efficiently and economically operated providers.

61. The Prospective Payment Assessment Commission ("ProPAC") and HCFA annually recommend an MPPUF level to Congress. ProPAC arrives at the recommended MPPUF level by making adjustments to the DRI Market Basket Index to reflect various factors including increases in prices of goods and services, previous Medicare overpayment, medical technology changes, changes in productivity, changes in practice patterns, site selection, and cod-

ing improvements, also known as DRG creep. (Ex. A–372) Congress then sets the MPPUF on the basis of budgetary and political reasons. The MPPUF ultimately set by Congress is generally at the low end of the range of update factors recommended by ProPAC.

62. DSHS adopted MPPUF shortly after Judge Dimmick invalidated DSHS's 23.7 percent across-the-board reduction in DRG rates under the first generation system. This decision, together with a reduction in DSHS's budget for the 1987–89 biennium, resulted in a severe appropriation shortfall. In June of 1987, DSHS staff developed a series of options on how to address the shortfall. DSHS selected an option known as Option 1.B, which called for the immediate substitution of the MPPUF for the DRI Market Basket Index as the inflation index in the first generation DRG payment system. At the time, DSHS expected the MPPUF, which is set by Congress in October of each year, to be .75 percent.[6] DSHS made the substitution of the MPPUF in TN 87–15, which was implemented on July 1, 1987 and submitted to HCFA on September 28, 1987.[7] Without the change to MPPUF as of July 1, 1987, DSHS estimated that there would have been a Medicaid budget shortfall of more than $31.7 million dollars ($14.6 million in State funds). (Ex. 51, pp. 2, 4). By replacing the DRI Market Basket Index with MPPUF, DSHS estimated that the shortfall in its Medicaid budget would be reduced to $28.3 million ($12.8 million in State funds). (Ex. 51, p. 7). *See also* Depo. of Roger Gantz, Vol. 8, pp. 13–14.

63. During the formulation of the second generation DRG system, Peat Marwick advised DSHS that the MPPUF was a "political football." Peat Marwick also advised DSHS that it should not adopt an inflation factor lower than DRI without

---

**6.** The MPPUF ultimately established by Congress on October 1, 1987 was zero percent. Accordingly, DSHS used zero percent as its inflation factor in the calculation of Medicaid reimbursement payments, effective October 1, 1987. Although Congress subsequently raised the MPPUF factor to 2.7 percent, effective November 21, 1987, DSHS continued to apply an inflation factor of zero until April 1, 1988, when TN 88–8 was implemented.

**7.** TN 87–15 was the subject of cross motions for summary judgment prior to trial. The Court denied the cross motions for summary judgment on the basis of *Green v. Mansour*, 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985), and because there were genuine issues of material fact in dispute.

determining that such an inflation factor reflected local Washington State conditions. Peat Marwick further recommended that DSHS should not adopt the ProPAC and HCFA discretionary adjustments used to set the MPPUF unless DSHS first determined that the various policy adjustments addressed specific features in the Washington hospital industry.

64. DSHS elected to use the MPPUF, the Medicare update factor, for changes in inflation and other variables because the State's Medicaid system "is also a DRG-based system, which impacts on factors affecting provider costs (e.g., provider efforts at cost containment, practice patterns, site selection) in a manner similar to the Medicare DRG System." (Ex. 439, p. 10). The State represented to HCFA that MPPUF "represents a reasonable rate of growth in the cost of hospital services," thereby ensuring that State rates comply with federal law and "are well above hospitals' average variable costs." (Ex. 439, p. 10).

65. Ron Kero testified that he selected MPPUF from a range of options in order to meet budget targets and to reign in excessive hospital inflation, which was increasing at rates three to five times greater then the Consumer Price Index. This is in contrast to the State's written representations to HCFA on September 28, 1987 that one of the reasons for the change from the DRI Market Basket Index to MPPUF was that Washington hospitals' costs "reflect historically low lengths of stay and low costs per discharge in the State of Washington." (Ex. 53). Mr. Kero testified further that he rejected the DRI Market Basket Index as an inflator because in his view DRI does not represent the actual rate of hospital inflation; rather, DRI measures only increases in hospital inputs. Kero also concluded that the DRI Market Basket Index does not take into account other factors affecting hospitals' costs such as changes in productivity, practice patterns and technology.

66. MPPUF does not represent the actual rate of growth in the cost of hospital services in Washington State. (Exs. 803 and 897). The State has admitted that it knew that since 1985 Washington hospitals have been experiencing increases in operating costs exceeding DRI Market Basket rates. Pretrial Order, Admitted Fact 22. Notwithstanding this fact, prior to the adoption of TN 88–8, DSHS did not conduct any investigation to determine whether the inflation experienced by Washington hospitals was due to increases in costs that must be incurred by economic and efficient providers. In addition, DSHS did not investigate whether it was possible for economic and efficient providers to keep increases in their operating and medical education expenses to the level of the MPPUF. DSHS also failed to determine whether the discretionary adjustments ProPAC made to the DRI Market Basket Index were applicable to Washington hospitals.

67. MPPUF is only used prospectively by Congress to increase Medicare rates. DSHS applied MPPUF retroactively to limit payment amounts to a level substantially below actual costs when it used MPPUF to trend forward two of the three 1985 base year components.

68. On September 22, 1988, after DSHS submitted to HCFA a proposal to implement the second generation DRG system, HCFA informed DSHS that it did not have a reasonable basis upon which to accept the State's assurance that the proposed rates were reasonable and adequate to meet the costs that must be incurred by economic and efficient providers. HCFA noted in Exhibit 34 that:

[I]t was the intention of Congress that States, when establishing Medicaid payment rates for hospitals and long-term care facilities, use rates which take into account economic conditions during the period for which the rate has been established. In its methodology, the State proposes to calculate current and future rates based upon updates of the base year (1985) cost using the [MPPUF]. This factor is used to establish the annual increases in Medicare's DRG payments. It is intended to account for a number of variables other than inflation, such as coding improvements and pro-

ductivity improvements, and is designed to reflect hospitals' Medicare payment experience under PPS. It is not clear how the State's use of this factor will support its assurance that the proposed rates are reasonable and adequate to meet the costs which must be incurred by an economically and efficiently operated facility.

69. In its first formal submission of TN 88–8 to HCFA on May 12, 1989, DSHS told HCFA that it selected MPPUF to adjust 1985 base year costs because MPPUF "represents a reasonable rate of growth in the cost of hospital services, as determined by Congress and HCFA," and because selection of MPPUF ensured that Washington's Medicaid rates would be in compliance with the upper limits requirements in 42 C.F.R. § 447.253(b)(2). (Ex. 23).

70. A comparison of inflation factors for the period 1985 to 1988 is shown on Exhibit 803. The percentage change in hospital costs using MPPUF was 2.9 percent as compared to 12.6 percent using the DRI Market Basket Index. During the same period of time, the actual increase in costs of Washington hospitals was approximately 17.7 percent. As a result of using MPPUF, in conjunction with other rate components in the new second generation system, DRG payments to the hospitals in 1988 were less than their 1985 actual Medicaid costs. Dr. Dobson, one of plaintiffs' expert witnesses, estimated that the amount of loss in payments to Washington hospitals during the first six months of the new plan (April 1, 1988 through September 30, 1988) due to the use of MPPUF and the capital freeze was approximately $4.5 million. The total shortfall in reimbursements for each full year of the Plan would be more than twice this amount. Thomas Johnson admitted at trial that as late as July 1, 1989, when the most recent amendment, TN 89–17, was implemented, the State still had made no investigation and had no evidence that an efficiently and economically operated hospital could limit its costs to the MPPUF rate of inflation.

71. The effect of capping costs at the median and using MPPUF is illustrated by Exhibit 114. The following four hospitals, which had uncapped component costs in the base year, received the following payments relative to their actual costs as of June 30, 1988, as shown at page 19 of Exhibit 114:

Central Washington was paid 59% of cost (payment = $1484; cost = $2511)

Good Samaritan was paid 79% of cost (payment = $2013; cost = $2542)

Olympic Memorial was paid 56% of cost (payment = $1272; cost = $2245)

St. Joseph—Tacoma was paid 49.6% of cost (payment = $2208; cost = $4444)

### 1. Upper Limits Requirements

72. Federal financial participation in Washington's Medicaid program is not available to the extent that payment levels exceed certain defined "upper limits." 42 C.F.R. § 447.257. The upper limits requirement provides that the aggregate Medicaid payments "may not exceed the amount that can reasonably be estimated would have been paid for those services under Medicare payment principles." 42 C.F.R. § 447.272. DSHS must, whenever it makes a change in its methods and standards, but not less often than annually, make a finding that proposed payment rates will not exceed the upper payment limits.

73. In adopting MPPUF in TN 87–15, DSHS informed HCFA that the change was necessary to ensure compliance with the upper limits requirement. HCFA instructed DSHS on how to do the upper limits calculation, informing DSHS that the Medicare upper limit is to be determined by taking 1981 Medicare base year costs and inflating them to the payment year using the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA") target rates published each year in the Federal Register (Ex. 130).

74. In February of 1988, DSHS submitted to HCFA an upper limits analysis for TN 87–15 which compared Medicaid payments under TN 87–15 to payments under Medicare's prospective payment system. HCFA rejected this analysis, calling it "questionable," and informed DSHS that

the "correct comparison" in the upper limits analysis "is the State's aggregate payments with the amount that would have been paid had the applicable Medicare reimbursement principles been applied." (Ex. 130). DSHS then submitted a correct upper limits analysis that showed that rates under TN 87–15 were 25 percent below the upper limit.

75. In adopting TN 88–8, DSHS again represented to HCFA that use of the MPPUF inflator was necessary to comply with the upper limits requirements. When DSHS performed an upper limits calculation for TN 88–8, the results showed that the payment rates under TN 88–8 were approximately 6 percent under the upper limits. This presents a mathematical impossibility since TN 88–8 payment rates were 11–12 percent lower than those under TN 87–15, which were 25 percent below the upper limits. All other factors being equal, the payment rates under TN 88–8 should have been more than 25 percent below the upper limits. In April 1990, in its final submission to HCFA, the State once again computed the upper limits calculation and concluded that the rates would be 5 percent below upper limits. This calculation was incorrect because it was based on a 1985 Medicare base year rather than the required 1981 TEFRA base year. DSHS staff offered various explanations for the discrepancies in the various calculations of the upper limits throughout the course of the trial, including claims of lost data and a desire to shift to better methodologies. Thomas Johnson testified at trial that the upper limits calculations for TN 87–15 and TN 88–8 were done differently and that this accounts for the inconsistent results. Mr. Johnson stated that the analysis for TN 87–15, showing that the State was 25 percent below the upper limits, used correct 1981 base year Medicare data, but excluded from its calculation the 20 percent of all claims paid on an OE/TRSR basis. The calculation for TN 88–8, showing the State to be 5 percent below the upper limits, used 1985 base year data and included all claims. According to Mr. Johnson, this accounts for the significant increase in payment levels in TN 88–8's upper limits calculation. DSHS admitted, however, that DSHS also included in its upper limits calculation for TN 88–8, payments that are not subject to the upper limits test, including disproportionate share payments and certain capital reimbursements. Thus, the payment levels in TN 88–8's upper limits calculation were overstated to the extent such payments were included.

76. The Court finds that DSHS's claim that it had to adopt MPPUF in order to meet the upper limits requirements is not credible. The evidence establishes that DSHS's initial adoption of the MPPUF in TN 87–15 and its use of the MPPUF in TN 88–8 were driven by budgetary constraints and were not necessary to satisfy the upper limits requirements of federal law. This finding is further supported by the fact that DSHS has informed the Court that it intends to substitute the DRI Market Basket index for MPPUF in its 1991 amendment to the Medicaid reimbursement plan which was previously enjoined by this Court pending trial.

### 2. Presence of Adjustment Factors in Washington

77. DSHS adopted and maintained use of the MPPUF knowing that the MPPUF for 1986, 1987, and 1988 contained a downward adjustment for DRG creep. DRG creep is an increase in average case mix due to the assignment of cases to higher DRGs than the DRGs to which they were typically assigned in the past. Generally, DRG creep is caused by the assignment of certain other secondary diagnoses or additional procedures which cause the case to be assigned to a DRG with a higher relative weight. This results in a higher payment than would otherwise be made had the secondary diagnosis not been recorded or the procedure not performed. Mr. Gantz testified that DSHS conducted no investigation to determine if DRG creep had occurred in Washington. Mr. Gantz's predecessor, Mr. Thomas Bedell, had determined in 1986 that the DRG creep phenomenon had not occurred in Washington State, but DSHS discounted Mr. Bedell's study as too quick to be reliable.

78. Thomas Johnson testified that he believes that DRG creep had occurred in Washington. His belief is based on marked changes in case mix at Children's Hospital from base year 1985 to 1988, which he attributes to coding improvements, and information contained in documents produced by the plaintiff hospitals during discovery in this case. Mr. Johnson admits, however, that when the State selected MPPUF as its inflation factor it did so without having conducted any study as to whether DRG creep had occurred. He admits that as of the time TN 88–8 was implemented the State had no evidence of DRG creep in Washington.

79. DSHS adopted and maintained use of the MPPUF without investigating whether and to what extent the other discretionary adjustment factors used by ProPAC to set MPPUF occurred in Washington. Mr. Johnson testified that DSHS's Washington-specific investigation into the applicability of the MPPUF discretionary adjustment factors consisted only of a thorough reading of ProPAC reports and DSHS's reliance on its professional knowledge of the hospital industry.

80. Since 1986, the State, through the Hospital Commission and now the Department of Health, has collected and annually published data for each hospital in the state that reflect actual cost increases or decreases for operating expenses and capital costs that have been adjusted for changes in case mix of patients. The data are called "Trend Reviews." The Trend Review data are detailed and displayed in the same manner as the inflationary inputs of the components of the HCFA–DRI Market Basket including wage and salary costs, changes in drug and supply costs, and the like. The Trend Reviews also separately show changes in hospital productivity, changes in inpatient/outpatient treatment, and changes in volume and case mix of patients.

81. The Trend Review analysis displays a net increase or decrease in operating expenses and capital costs for each hospital, which takes into account all changes in price inputs and any reductions, called "Op-erating Expense/Adjusted Case Mix Value Unit," and displays the changes or trends over a period of five years. DSHS did not consult the Hospital Commission Trend Reviews, available for 1987 and 1988, and subsequent years, to determine whether use of the MPPUF was appropriate in Washington.

82. These Trend Reviews reveal that Washington hospitals experienced increases in operating and capital costs greater than the DRI even after taking into account the effect of various discretionary adjustments.

83. DSHS knew at the time it adopted the MPPUF that the Hospital Commission had approved net cost increases that exceeded the DRI, but adopted the MPPUF without investigating whether the Hospital Commission-approved increases were increases in costs that had to be incurred by economic and efficient providers in Washington.

D. *Freeze of Capital at the 1985 Level*

84. In calculating a hospital's DRG formula price rate under TN 88–8 and all subsequent plan amendments, the capital cost component was limited to the lesser of its 1985 capital costs or the 1985 peer group median capital costs. Capital costs include depreciation, interest, and lease expenses. Witnesses at trial estimated that a hospital's capital costs are approximately 9 percent to 10 percent of the hospital's total costs.

85. DSHS decided to limit capital costs to 1985 levels primarily for two reasons: (1) prior reimbursement systems had reimbursed capital based on budgeted amounts that had been approved by the Hospital Commission, which subsequent investigations showed were sometimes greater than actual capital expenditures, and (2) there was excess capacity across the state in the hospital industry. DSHS also believed that the impact on hospitals of the freeze on capital would not be significant because the amount of inflation on capital represents only a small fraction of the total Medicaid reimbursement amount. Approximately ten percent of Washington hospitals' reve-

nue is generated from Medicaid business. Capital costs represent about 9–10 percent of the hospitals' total costs. Ninety percent or more of all capital costs consists of fixed capital costs such as depreciation or interest which normally do not inflate over time. Generally, depreciation remains constant for the life of the plant, property or equipment and interest decreases over the life of the loan. Thus, the amount of actual inflation on Medicaid-related capital is extremely small relative to overall Medicaid reimbursement or hospital revenues. DSHS believed that any shortfall in actual capital inflation could be made up at the time the hospitals' payment rates were rebased. Under TN 88–8, rebasing of rates was scheduled to occur no later than five years from the date the plan was implemented.

86. Evidence presented at trial supports DSHS's belief that there is excess capacity, also referred to as "overbedding," in Washington hospitals. This is true regardless of whether hospital occupancy is measured as a percentage of *licensed* beds or a percentage of *available* beds. Measuring occupancy by percentage of licensed beds in use is based on the number of beds licensed by the State for inpatient utilization. It does not take into account the fact that some licensed beds have been converted to outpatient or other uses and are, therefore, not in fact available for inpatient use. For example, in 1988, 43 of the 176 licensed beds at Central Washington Hospital had been converted to other uses such as outpatient dialysis, short stay, occupational therapy, and family sleeping rooms. (Ex. 823). At Swedish Hospital, 100 of the hospital's 697 licensed beds had been converted to other uses in 1988. (Ex. 828). An occupancy rate based on a percentage of available beds removes from the denominator those beds that have been converted to other uses and is, therefore, a more accurate measure of a hospital's utilization of beds available for inpatient use.

87. A study prepared by DSHS staff in February 1991, shows that the average occupancy rate for Washington hospitals in 1987, based on a percentage of licensed beds, was 49.78 percent, and based on the percentage of available beds, was 56.77 percent. (Ex. A–355). For 1988, the statewide occupancy rates based on licensed and available beds were 48.66 percent and 56.44 percent, respectively; for 1989, 48.63 percent and 56.43 percent. Even hospitals that are cost-conscious and relatively efficient have excess beds. In 1988, Central Washington Hospital, a hospital that was uncapped in the base year, had an occupancy rate based on available beds of 80 percent. Based on licensed beds, its occupancy rate was 60.4 percent. For the same period, the figures for Swedish Hospital were 71.4 percent and 62.2 percent, respectively. (Ex. 842) Accordingly, it was reasonable for DSHS to conclude that Washington hospitals in general are overbedded. *See also* Exhibit 842 which compares occupancy rates for selected hospitals for 1985 and 1988.

88. Gretchen Engquist, a partner with Peat Marwick who has expertise in Medicaid prospective payment systems, testified that virtually all states treat capital costs differently from other costs. Most states do not inflate capital. Rather, capital costs are paid on a "pass-through" basis. States reimburse hospitals for their actual capital expenditures less a particular percentage, usually 15 percent. Ms. Engquist testified that it is more equitable for a State to establish a capital limit than to pay capital costs on a pass-through basis. In her opinion, paying capital on a pass-through basis does not reward efficient hospitals because all hospitals, regardless of efficiency, have their capital costs reduced by a certain percentage. The Court found Ms. Engquist's testimony on this subject to be credible and accepts it.

89. The Court finds that it was reasonable for DSHS not to inflate the capital component of the hospitals' 1985 base year costs. DSHS's decision not to inflate capital was rationally connected to the fact that Washington hospitals in general have excess capacity, that the amount of actual inflation on capital is very small relative to total Medicaid reimbursement, and that shortfalls in capital reimbursement could be corrected in the rebasing process.

E. (1) *Excluding Outliers from the Base Year Costs*

90. Outliers are cases with extraordinarily high or low costs when compared to other cases in the same DRG. In calculating the 1985 base year costs used to set the hospitals' second generation DRG payment rates, DSHS removed the costs of outliers. This resulted in a substantial understatement of total hospital costs and a lower median cap in each component of the base year costs.

91. The State's decision to remove outliers from the 1985 base year removed cases with extraordinary costs from the total 1985 costs of each hospital. Normally, hospitals experience a number of Medicaid outlier cases each year that result in high cost extraordinary care and services. These are the most expensive Medicaid cases in the system. The State's decision to remove these cases from the 1985 base year costs in determining an average cost for each hospital, when combined with capping costs at the median for each peer group, significantly reduced the median cost and thereby reduced the rate of reimbursement to the hospitals. This decision was made for budget reasons without any investigation as to whether or not the necessary costs of economic and efficient hospitals would be paid in accordance with federal law.

92. The State argues that if outlier cases remained in the base year costs, the average cost of treating various DRG procedures would be overstated. The Court finds that the removal of these high cost cases in combination with the median capping procedures substantially understates the actual costs being incurred by the hospitals in treating Medicaid hospital inpatients.

(2) *Payment of Outlier Cases*

93. The State also decided to pay outliers in a different manner than other cases.

94. To qualify as a DRG high cost outlier, the allowed charges for the case must exceed a threshold of three times the applicable DRG payment or $14,000, whichever is greater. To qualify as a low cost outlier case, the allowed charge must be less than the greater of 10 percent of the applicable DRG or $200. (Ex. 439, p. 44). Reimbursement for high cost outlier cases, other than cases in children's hospitals and psychiatric DRGs, is equal to the applicable DRG payment amount plus 60 percent of the hospital's OE/TRSR ratio applied to allowed charges exceeding the outlier threshold. (Ex. 439, p. 44). Reimbursement for low cost outliers is determined by multiplying the allowed charge by the hospital's OE/TRSR ratio. DSHS's formula for paying high cost outlier cases results in nonpayment for a significant portion of the costs of certain outlier cases because it establishes a zone of nonreimbursement between the DRG amount and $14,000 or some higher amount equal to three times the DRG amount. DSHS decided to adopt such a formula to discourage high cost outliers.

95. Gretchen Engquist testified that all states have a zone of nonreimbursement applicable to outliers because it discourages outlier cases. However, other states, unlike Washington, include the cost of outliers in their calculation of average Medicaid base year costs, thereby increasing the applicable DRG rate.

96. The State did not make any investigation as to the financial impact of its decision to treat outlier cases differently during the second generation system. Dr. Dobson, an expert witness for the plaintiffs, testified that $4.2 million in Medicaid reimbursement was lost to the Washington hospitals during the first six months of the new plan as a result of the treatment of outliers in the second generation payment system.

97. During the second generation DRG plan in effect since April 1, 1988, economically and efficiently operated providers have had outlier Medicaid cases and have not been fully reimbursed for these cases because of the payment methodology under the State Plan.

F. *No Inflation on OE/TRSR Payments*

98. There is no inflation factor applied to payments made under the OE/

TRSR method. DSHS does not inflate such payments because they are based on a ratio of costs to charges. Charges are set by the hospitals and may be increased by the hospitals as a result of inflation or other factors. Thus, it was reasonable for the State not to apply an inflation factor to OE/TRSR payments.

## VII. BASIS FOR FINDINGS AND ASSURANCES

### A. *DSHS's Findings Implicit in the State Plan*

99. Federal Medicaid law requires that the State, at a minimum, make "findings" which identify and determine (1) efficiently and economically operated hospitals; (2) the costs that must be incurred by such hospitals; and (3) payment rates that are reasonable and adequate to meet the costs that must be incurred by economically and efficiently operated hospitals. *Amisub*, 879 F.2d at 796. DSHS contends that it made such findings both on an annual basis as is required by 42 C.F.R. § 447.253(b) and each time a plan amendment was implemented.

100. As of April 1, 1988, when TN 88–8 became effective, DSHS had made no attempt to identify or determine economic and efficient providers. The State's finding that the rates established under TN 88–8 met the costs that must be incurred by economic and efficient providers was based on the methodology employed to establish the rates. According to DSHS, the *Amisub* findings were implicit in the second generation DRG rate setting methodology. DSHS told HCFA in its May 12, 1989 submission, Exhibit 23, that the rates were set under a methodology that uses "relative measures of efficiency and economy," such as capping operating, capital and medical education costs at the peer group median and inflating such costs by the MPPUF. DSHS made similar findings for TN 88–11 and TN 89–14.

101. DSHS contends that an economic and efficient hospital was implicitly defined in the plan as a hospital with (1) uncapped component costs in the 1985 base year, (2) increases in operating and medical edu-

cation costs at or below the level of the MPPUF, and (3) capital costs at the 1985 base year level. As of the time TN 89–14 was implemented on July 1, 1989, DSHS had made no investigation to determine whether there were any such hospitals in Washington State.

102. By the time TN 89–17 was implemented on October 1, 1989, DSHS still had not identified and determined economic and efficient providers. Mr. Johnson testified that DSHS has never defined an economic and efficient hospital nor attempted to identify any specific hospital or group of hospitals that is economic and efficient. Mr. Johnson also admitted that the State has no data that shows whether the actual payments made to Washington hospitals under the new DRG system reimburse *any* Medicaid providers for their necessary costs. Rather, Mr. Johnson relies on the rate setting methodology to identify groups of hospitals that *"may be"* economic and efficient and *may* have these costs paid. Hospitals that *may be* economic and efficient are uncapped hospitals with cost increases limited to the MPPUF level and capital costs at 1985 levels. DSHS views these hospitals as hospitals that *may be* economic and efficient, rather than hospitals that *are* economic and efficient, because the state plan methodology accepted such hospitals' Medicare allowable costs for fiscal year 1985 as reasonable costs when such costs may not have been costs that "must be incurred." DSHS's position is that some or all of the hospitals that meet the State Plan's implicit definition of an economic and efficient provider may not be truly economic and efficient because they may still have inefficiencies.

103. The rate setting methodology in the second generation DRG system also does not identify or determine costs that must be incurred by hospitals that "may be" economic and efficient. Rather, according to DSHS, the methodology defines costs that must be incurred as a range of costs incurred by hospitals that "may be" economic and efficient.

104. The Court finds that DSHS never identified or determined efficiently and eco-

nomically operated hospitals or the costs that must be incurred by such hospitals. The Court further finds that TN 88–8 fails to provide any objective benchmark or basis to evaluate the State's reimbursement system under federal law. TN 88–8 does not implicitly provide any framework to identify and determine economic and efficient hospitals in Washington. Thus, there is no way, based solely on the rate setting methodology in the State Plan, to determine whether the payment rates meet the costs that must be incurred by economic and efficient providers.

### B. *Findings Outside the State Plan Methodology*

105. By July of 1989, however, DSHS had developed certain "external tests," which it used to test whether its payment rates met the costs that must be incurred by economic and efficient hospitals. The three external tests are: (1) the marginal costs test, (2) the efficiency and economy test, and (3) the Best Practices Model. These external tests are *not* part of the State Plan and are unrelated to the second generation rate setting methodology in TN 88–8 and subsequent amendments. Rather, these tests have been developed during this litigation to evaluate the rates adopted as a result of TN 88–8. DSHS has also submitted to HCFA and this Court various cost-to-payment analyses designed to demonstrate that the second generation DRG payment system meets the costs that must be incurred by economic and efficient hospitals.

### 1. Marginal Costs Test

106. DSHS contends that the Boren Amendment requirement that states pay rates that are reasonable and adequate to meet "the costs which must be incurred" by economically and efficiently operated facilities can reasonably be interpreted to mean that states need only pay a hospital's marginal costs in treating Medicaid patients. The State contended in its submission on May 12, 1989, Exhibit 23 at page 37, that "the relevant Boren Amendment test is whether or not those additional costs incurred by the hospital [marginal or varia-

ble costs] are adequately reimbursed by Medicaid payments." For the most part, the State uses the terms "marginal" costs, "variable" costs, and "incremental" costs interchangeably to describe the additional costs incurred as a result of treating Medicaid patients. Mr. Johnson and the State's expert witnesses testified that technically speaking, "marginal" costs and "variable" costs are different concepts; "marginal" costs is a term used by economists while "variable" costs is an accounting term. Nevertheless, the State agrees that for purposes of this litigation, there is no need to distinguish between marginal and variable costs. For purposes of making these Findings, the Court will use the term "variable" where the State has used that term to describe a particular test. Otherwise, the Court will use the term "marginal" to describe the State's theory and tests.

107. During the period April 1989 through April 1990, the State developed and submitted various marginal or variable tests to HCFA to support the State's position that TN 88–8 was in substantive compliance with the federal Medicaid laws because the Plan paid the marginal costs of Washington hospitals. These various tests, in chronological order, are contained in Exhibit 23 (May 12, 1989), Exhibit 45 (November 22, 1989) and Exhibit 439 (April 16, 1990), and are discussed in connection with these various submissions. The State also created several external tests to support its position. The external tests are outlined in Exhibits 423 and A–387 and will also be discussed in these Findings.

#### a. *May 12, 1989 Submission to HCFA*

108. The State's marginal cost theory first appeared in DSHS's May 12, 1989 submission to HCFA of TN 88–8. DSHS told HCFA that in its view the State was permitted under the Boren Amendment to find that the cost that an efficiently and economically operated hospital must incur is the incremental cost that the hospital incurs to treat Medicaid patients. DSHS's position was that the incremental cost of treating Medicaid patients could be determined on the basis of "what portion of a

provider's cost [sic] typically are variable (i.e., costs that are affected by each Medicaid admission), as opposed to fixed costs, which the hospital would incur even without Medicaid admissions." (Ex. 23). DSHS submitted a cost-to-payment analysis comparing payments under the second generation DRG system to the average variable costs of each hospital in an effort to show HCFA that payment rates under the second generation system paid the costs that must be incurred by economic and efficient providers, that is, variable costs.

109. To determine the average variable costs for each hospital, DSHS used peer group-specific fixed-to-variable cost ratios which had been used by the Hospital Commission to make year-end budget conformance adjustments. DSHS did not conduct any investigation to determine whether the fixed-to-variable cost ratios used by the Hospital Commission approximated actual fixed-to-variable ratios of hospitals in the State of Washington. For peer group A hospitals, which are essential rural hospitals, the Hospital Commission fixed-to-variable cost ratio was 80 percent fixed costs to 20 percent variable costs. Eighty percent of a peer group A hospital's average total costs were deemed attributable to fixed costs, while 20 percent of the average total costs consisted of variable costs. For peer group B hospitals, the fixed-to-variable cost ratio was 65 percent to 35 percent. Peer groups C and D hospitals had 50 percent to 50 percent ratios. For each hospital, DSHS calculated estimated average total costs by using the State Plan's 1985 base year uncapped costs inflated to the payment year (1988) using DRI.[8] To obtain average variable costs, DSHS multiplied average total costs by the appropriate peer group variable cost percentage. DSHS then compared this figure to the average payment under TN 88–8. For Lincoln Hospital, for example, DSHS multiplied Lincoln's estimated total Medicaid costs ($58,080) by 20 percent, the variable cost proxy for peer group A hospitals, to arrive at Lincoln's estimated variable costs ($11,616). DSHS compared

this amount to Lincoln's payments under the second generation DRG system, estimated to be $44,551, to show that the State Plan would pay 380 percent of Lincoln's "costs which must be incurred." *See* Exhibit 23, p. 44. The State's comparison of variable costs to total payments showed that 99 percent of Washington hospitals would have their variable costs paid under the State Plan. *See* Exhibit 23. In contrast, a comparison of the total average costs to total payments by plaintiffs' expert Huebner demonstrated that only approximately 30 percent of Washington hospitals would have their total average costs paid.

110. The cost-to-payment analysis in DSHS's May 12, 1989, submission to HCFA, Exhibit 23, was an inaccurate cost-to-payment comparison. DSHS calculated the average total costs of hospitals using 1985 Medicare allowable costs for DRG services only. In contrast, payments were calculated using payments for all Medicaid services. Thus, the cost-to-payment comparison excluded the costs of, but included the payments for, neonatal services, rehabilitation services in some hospitals, psychiatric services in free standing psychiatric hospitals, AIDS services, bone marrow transplants, and other services reimbursed under outlier payment methodologies. The result was an overstatement of the percentage of average total costs, and hence average variable costs, paid by the State Plan.

111. The cost-to-payment analysis contained in Exhibit 23 also overstates the percentage of hospital costs paid as a result of DSHS's method for calculating estimated average total costs. Average total costs for 1988 were calculated by inflating 1985 uncapped base year Medicare allowable costs by the DRI. DSHS used the DRI to inflate 1985 costs even though it knew that hospital costs were increasing at a rate significantly higher than DRI. Thus, estimated average total costs, from which average variable costs were derived, were significantly lower than actual average total costs.

---

**8.** The State was never able to explain to the Court's satisfaction why the State used DRI to inflate 1985 costs for its variable cost test when it had used MPPUF to inflate these same costs for the second generation DRG system.

112. On June 19, 1989, a representative from HCFA's regional office in Seattle, unaware of the inaccuracies in the cost-to-payment analysis, nevertheless informed DSHS that HCFA was dissatisfied with the May 12 submission. The HCFA representative told DSHS that HCFA's Office of General Counsel believed that "costs which must be incurred" by economic and efficient providers as used in the Boren Amendment "pertains to total costs and not just variable costs as used by the State." (Ex. 41). HCFA noted that on a variable cost basis all but one hospital would have its variable costs paid, yet on a total cost basis, less than 24 percent of hospitals would have their total costs paid, according to HCFA's calculations. HCFA concluded that a court of law would deem this percentage of total costs paid to be unacceptable. DSHS subsequently withdrew its May 12 submission.

b. *November 22, 1989 Submission to HCFA (Exhibit 45)*

113. DSHS submitted the same inaccurate variable cost-to-payment analysis to HCFA in its November 22, 1989 submission. (Ex. 45). In that submission, however, DSHS did not contend that it need only pay variable costs to comply with the Boren Amendment. Rather, DSHS submitted the variable cost analysis as one of several bases for support of its assurance to HCFA that the rates were reasonable and adequate to meet the costs that must be incurred by economic and efficient providers. Sometime after November 22, 1989, the plaintiffs advised HCFA of the deficiencies in the cost-to-payment analyses submitted on May 12 and November 22, 1989. DSHS subsequently withdrew its November 22, 1989 submission.

c. *April 16, 1990 Submission to HCFA (Exhibit 439)*

114. In its final submission of TN 88–8 to HCFA, DSHS submitted a variable cost analysis in which it compared average variable costs for all Medicaid patients, using Hospital Commission fixed-to-variable cost ratios, to average total payments for all Medicaid patients. (Ex. 439). This analysis showed that all but one hospital had their variable costs paid under the second generation payment system. Plaintiffs' expert Steve Huebner testified that under this test, approximately 30 percent of the hospitals had their total costs paid.[9] Average total costs for 1988 were again calculated by the State using 1985 uncapped base year Medicare allowable costs inflated by the DRI, which was at that time 13 percent. DSHS used these cost estimates despite the fact that it had obtained from the Department of Health actual cost data showing increases from 1985 to 1988 in excess of DRI. A DSHS study using the Department of Health data, dated March 8, 1990 (Ex. 897), showed that operating expenses for Washington hospitals, adjusted for case mix, increased on the average 15.96 percent during the same period.

d. *Johnson Affidavit—(Exhibit 423 A)*

115. In its summary judgment materials submitted to the Court in late April 1990, only a few days after DSHS's final submission to HCFA, DSHS reasserted its marginal cost interpretation of the Boren Amendment. In contrast to its submissions to HCFA, where DSHS used the 20 percent, 35 percent, and 50 percent Hospital Commission peer group-based variable cost percentages, DSHS used a uniform 60 percent of average total costs as a proxy for marginal costs. DSHS submitted a marginal costs test that compared estimated total costs and estimated marginal costs for the first twelve months of the second generation system (April 1, 1988 through March 31, 1989) to total payments under the system. Total costs were estimated using an OE/TRSR cost-to-charges ratio

---

**9.** According to plaintiffs' expert Huebner, when these costs are deflated using DRI and inflated for the actual cost increases experienced by hospitals in Washington, only 3 percent of all Washington hospitals have all their actual costs paid. Exhibit 114, a State draft response to HCFA prepared in April 1989, also concluded

that only 3.95 percent of all hospitals would have their actual costs paid. Although no party suggests that federal law requires that *all* actual costs must be paid, a program that would only reimburse 3–4 percent of all the Washington hospitals for their actual costs must be seriously suspect.

which was applied to hospital charges for the relevant period. The analysis showed that seventy-five out of seventy-seven hospitals had their marginal costs paid.

### e. *Gross RCC Marginal Cost Test (Exhibit A–387)*

116. DSHS presented to the Court an additional marginal cost test done in April of 1991, to show that second generation system payment rates pay the costs that must be incurred by efficient and economic hospitals. (Ex. A–387). This marginal cost analysis was not submitted to HCFA and did not serve as the basis for any findings made in connection with TN 88–8 or any of its amendments. In this analysis, covering the period July 1, 1989 through June 30, 1990, DSHS calculated costs by using a "gross RCC" ratio of costs to charges. The gross RCC ratio is a hospital-specific ratio of costs to charges for all patients, not just Medicaid patients. To calculate marginal costs, DSHS multiplied total costs, as determined by using the gross RCC, by 60 percent. The analysis shows that all but two hospitals have their marginal costs paid. Approximately eighteen percent of the hospitals have their total costs paid, and 66.3 percent of the hospitals have 80 percent or more of their total costs paid. (Ex. A–387).

### f. *Other Support for the Marginal Cost Theory*

117. As used by the State, the term marginal or incremental costs means short-run marginal costs and is estimated by DSHS to be equal to hospitals' estimated average variable costs. According to the State, short-run marginal costs are the costs that must be incurred by hospitals in treating Medicaid patients.

118. The State identified three bases for its marginal cost theory: (1) HCFA regulations identifying marginal costs, as measured at 60 percent of total costs, as appropriate costs to pay for *Medicare* outlier cases (Ex. A–360); (2) an appeals provision in the Virginia state plan which limits appeals to situations where the hospitals can show a marginal loss, calculated on a ratio of variable costs at 60 percent to fixed cost of 40 percent (Ex. A–329); and (3) a Hospital Commission decision in which the Hospital Commission found a discount given to a private third party payor to be cost justified because the hospital was paid more than the incremental cost of treating the additional patients (Ex. A–384). These factors do not provide a reasonable basis for finding that the Boren Amendment requires States to pay only marginal costs of efficient hospitals. The HCFA regulations identifying marginal costs as appropriate costs to pay in Medicare outlier cases are irrelevant to the State's obligation to reimburse Medicaid cases in accordance with Boren Amendment standards. The appeals provision in the Virginia state plan is also inapposite. That provision does not truly limit rate appeals to situations where a hospital incurs a marginal loss. Rather, "financial jeopardy," one of the requirements for obtaining additional reimbursement for operating costs relating to the provision of care to Medicaid patients, is *presumed to exist* if the hospital can demonstrate that it is, in the aggregate, incurring a marginal loss. Under the Virginia plan, if a hospital is not incurring a marginal loss, that hospital may still obtain additional reimbursement if it demonstrates that it has unique and compelling Medicaid costs which, if not reimbursed by Medicaid, would jeopardize its long-term financial viability. The plan has other appeals provisions relating to additional reimbursement for non-operating expenses. Virginia's limited use of a marginal loss test in its appeals provision has no bearing on whether the payment of marginal costs to Washington hospitals is sufficient to meet Boren Amendment standards. Finally, the Hospital Commission decision noted by the State is also irrelevant. The issue in that case was whether a negotiated discount between a hospital and a preferred provider organization resulted in "cost shifting" to other patients. The Commission found that "[a] negotiated rate which covers the variable costs of providing services to *new* patients *and* contributes to other fixed costs does not result in cost shifting" to other consumers. (Ex. A–384, p. 31 (emphasis added)). This decision

contributes little to the Court's understanding of whether the State's rates pay the costs that must be incurred by economic and efficient hospitals in Washington.

119. One of the State's expert witnesses, Dr. Steven Eastaugh, a professor at the School of Management and at the medical school of George Washington University in Washington, D.C., testified by deposition that in his opinion state Medicaid programs should, at a minimum, pay short-run marginal costs for hospital services. Dr. Eastaugh defined marginal costs as the extra, additional, variable costs associated with an additional quantity of care for additional patients or for a different payor group. He believed that payment at some amount *above* marginal costs makes a contribution to hospital return-on-investment and a contribution to fixed costs. Dr. Eastaugh's opinion is that if the State can demonstrate that it is paying 60 to 65 percent of the average cost that hospitals incur in treating Medicaid clients, it is covering the marginal cost of that care.

120. The deposition testimony of the plaintiff hospitals' Rule 30(b)(6) witnesses demonstrates that hospitals consider their own variable or marginal costs in making business decisions. The range of variable cost percentages varies from hospital to hospital, but is generally 30 to 60 percent of total costs. For example, Gary Wangsmo of St. Peter Hospital testified about an Arthur Andersen report showing that St. Peter's variable expenses were 60.73 percent. Scott Eyler of Providence Hospital of Everett testified about a study showing that Providence's variable costs were approximately 52 percent of total costs. Roy Gingrich of Tacoma General Hospital discussed a Touche Ross study showing that Tacoma General's marginal cost for service volume variance was 40 percent. Other designated witnesses testified that their hospitals had variable costs of 30 to 40 percent.

121. Hospitals with stable populations of Medicaid patients must also incur fixed costs in order to treat Medicaid patients in conformity with state and federal laws and regulations, and quality of care standards.

Thomas Troy, President and Chief Executive Officer of Central Washington Hospital, testified that 12–13 percent of Central Washington's patients are Medicaid patients, and that Central Washington would not have to have as many beds, or acquire as much equipment, if it did not serve Medicaid patients. He also testified that Central Washington had total capital expenditures for the period 1986 through 1988 of $4.2 million, and that all medical equipment and other capital assets purchased are available for Medicaid patients' use. John Bencich of Swedish Hospital gave similar testimony. Medicaid patients account for approximately 6 percent of revenues to Swedish. Swedish is a 600-bed acute, tertiary care facility. State and federal regulations and licensing requirements require Swedish and other hospitals to acquire certain capital assets. All capital assets are available for and used in connection with services provided to Medicaid patients. These are also costs that must be incurred by an efficiently and economically operated hospital in Washington. For example, hospitals that have purchased CT scanners use this equipment for all patients, including the Medicaid population.

122. If the State's Medicaid program were to pay only an efficient and economical hospital's average variable cost of serving Medicaid patients, the hospital would either have to cost shift the proportion of its fixed costs allocable to the Medicaid patients to other patients and payors, or absorb the losses incurred from the State's failure to pay such costs.

123. The Court finds that the State's Medicaid reimbursement system must pay more than variable or marginal costs of an efficiently and economically operated hospital under federal law. The Court finds that the State's external marginal or variable cost tests contained in Exhibits 23, 45, 439 and A–387 are not reliable tests, do not support the State's position that even variable costs of efficiently and economically operated hospitals in Washington have been paid, and should therefore be given little weight by the Court. The State's argument that the payment of variable costs alone would satisfy the requirements

to pay costs that must be paid under federal law is misplaced.

2. The Efficient and Economic Test

124. A second external test used by DSHS to support its finding that second generation payment rates are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers is the "efficient and economic test." This efficient and economic analysis first appeared in DSHS's November 22, 1989 submission of TN 88–8 to HCFA, which was later withdrawn. (Ex. 45) This test also appeared in the State's April 16, 1990 response to HCFA's request for additional information. (Ex. 439)

125. The efficient and economic test estimates the "efficient" costs of hospitals that "may be" economic and compares them to payments made under the second generation system. Hospitals that may be economic are those whose average total costs, as calculated by using uncapped 1985 base year Medicare allowable costs inflated by the DRI, are below the median for their peer group. To determine the "efficient" costs of such hospitals, DSHS adjusts the fixed costs of the hospitals by using an 85 percent occupancy adjustment factor. The State uses 85 percent occupancy, based on licensed bed capacity, as its standard for "efficient" occupancy and compares each hospital's reported inpatient occupancy rate to that standard. The State then adjusts downward that portion of each hospital's estimated total average costs which under the Hospital Commission's conformance adjustment process were treated as "fixed costs" (80 percent for peer group A hospitals, 65 percent for peer group B hospitals, and 50 percent for peer group C hospitals), to reflect what they would have been at an 85 percent occupancy level. These adjusted "fixed costs" are then combined with the balance of the hospital's average costs to result in what the State claims are the costs that must be incurred by an efficiently operated facility. The State then compares this occupancy adjusted cost figure to estimated payments under the second-generation DRG payment system.

126. The analysis submitted to HCFA on May 12, 1989, showed that all of the economic hospitals would have their "efficient" costs paid under the second generation system. The analysis in DSHS's final submission for TN 88–8, dated April 16, 1990, showed that all but two economic hospitals would have their "efficient" costs paid. The difference in results was attributable to the fact that the May 12, 1989 submission contained cost calculations for DRG services only, and compared such costs to payments for all patients.

127. DSHS selected 85 percent licensed bed occupancy as its measure for efficiency without conducting any investigation into the validity of that occupancy statistic as a measure of efficiency. While 85 percent available bed occupancy may be a reasonable occupancy goal for large urban hospitals, there is substantial evidence that a measure of occupancy based on licensed beds is not an appropriate or realistic goal, particularly for rural hospitals. DSHS also did not conduct any study to determine whether the fixed-to-variable cost ratios used by the Hospital Commission for year-end budget conformance reviews reflected actual fixed-to-variable cost ratios at the hospitals. Thomas Johnson testified that the 85 percent licensed bed occupancy figure came from a textbook that he had used in the 1970's which purported to identify 85 percent as an appropriate hospital occupancy level. However, Mr. Johnson was unable to locate or identify that book.

128. The use of occupancy as the measure of efficiency is a different test of efficiency from the one used in the second generation rate setting methodology. The rate setting methodology used median caps on cost components to distinguish between efficient and inefficient hospitals. This capping was done without regard to occupancy rates or any other recognized measure of efficiency. The result is that the payment rates under the State Plan bear no relationship to occupancy rates. The average Medicaid payment per dollar of hospital costs for the first six months of the second generation system, excluding disproportionate share payments, was $.0.79 for hospitals with less than 25 per-

cent occupancy, and $0.78 for hospitals with occupancy rates from 25 to 75 percent. There were no non-disproportionate share hospitals with occupancy rates over 75 percent (Ex. 781).

■■■■■ 129. Occupancy is some measure of whether a hospital is efficiently and economically operated. However, licensed bed occupancy is not a valid indicator because many licensed beds have been converted to outpatient or other uses. A better indicator is a hospital's utilization of beds available for inpatient use. The State's attempts to create an external test to measure occupancy was appropriate but the State's actual analysis provided little evidence in evaluating the overall substantive adequacy of rates under the State's plan. The Court finds that the efficient and economic test, as outlined in Exhibits 45 and 439, was created to justify the rates previously established, was based on incorrect facts and analysis, and therefore should be given little weight.

### 3. Best Practices Model

130. The Best Practices Model was not used as a basis for any findings or assurances related to TN 88–8 or any of its amendments. DSHS offers the Best Practice Model as evidence that its payments rates are reasonable and adequate to meet the costs that must be incurred by economic and efficient providers. (Ex. A–392a)

131. The Best Practices Model was developed by Dr. Gerard Anderson of Johns Hopkins University. Dr. Anderson testified at trial about the cost of excess beds in Washington, but significantly he did not testify as to his own Best Practices Model. The Best Practices Model compares the efficient costs of hospitals within a peer group to such hospitals' reimbursement under the second generation system. The Model uses six peer groups based primarily on urban/rural and wage differentials.

132. The Model first determines for each hospital within a peer group the cost of treating each DRG by department. Costs are determined by applying the ratio of costs to charges for each department in the hospital, as derived from the hospital's Medicare cost reports. The Model applies that ratio to the Medicaid charges for each DRG to obtain the cost of each DRG by department. Medicaid charges are derived from DSHS Inpatient Utilization and Expenditure Reports, also known as 1740 reports. The Model then lists each hospital in the peer group and its attendant cost per department for each DRG. The Model determines next the efficient cost of servicing each DRG by department. For example, the Model will determine the efficient cost of treating DRG 91, simple pleurisy, for any department that usually provides services or supplies to treat the patient. The Model then ranks hospital costs per department from highest to lowest and picks a percentile, in this case the 25th percentile, as the efficient cost for treating a particular DRG in each department. The Model sums up the efficient costs per department to obtain the total efficient cost for each DRG. The Model then compares each hospital's "efficient" cost to the hospital's reimbursement. The Model showed that all but three hospitals were having their "efficient" costs paid under the second generation system.

133. The accuracy and validity of the Best Practices Model depends upon uniform billing of charges by hospitals. Hospitals in the state are not required to allocate charges by department in a uniform manner and evidence admitted at trial establishes that they do not. Steven Huebner, one of plaintiff hospitals' expert witnesses, testified that he examined a statewide data base that gathers charge information and contacted several hospitals to determine if hospitals in the state allocate charges uniformly. He concluded that they do not. The Court finds this portion of Huebner's testimony to be very credible and adopts this testimony.

■■■■ 134. Without uniform billing of charges, the Best Practices Model is of extremely limited utility because there is no reliable comparison of hospital charges by department. Some hospitals may fail to allocate any charges to a particular department even though there were in fact applicable charges. Since zeros count in the

calculation of the 25th percentile, there is a substantial likelihood that the Model's 25th percentile cost may in fact be substantially lower than the true 25th percentile cost. In addition, the State's selection of the 25th percentile was itself arbitrary and was selected to obtain the best results under the study. Accordingly, the Court gives the Best Practices Model little weight to the extent it attempts to establish efficient costs. The Court does not criticize the data used in the Best Practices Model, but finds that the Model's methodology for approximating "efficient" costs is seriously flawed.

### C. *Other Bases for Findings and Assurances that Rates are Adequate*

135. DSHS contends that its findings for TN 88–8 and its amendments that the rates were reasonable and adequate to meet the costs that must be incurred by economic and efficient hospitals are based in part on the selective contracting program, third-party discounts and hospital inefficiencies.

#### 1. Selective Contracting Program

136. The selective contracting program is a separate payment program which is exempt from Boren Amendment requirements pursuant to a waiver obtained by DSHS from HCFA.

137. During 1988, 22 hospitals entered into selective contracts with the State and provided approximately 38 percent of all Medicaid services rendered during the first year. (Ex. A–137 A). Since 1988, three additional hospitals entered into selective contracts with the State and the State now estimates that approximately 43 percent of all the Medicaid services are performed under contract by these hospitals.

138. Washington hospitals subject to the State's Medicaid selective contracting program have submitted bids or entered into contracts with the State to provide services to Medicaid patients at payment rates equal to or less than rates they would have received under the State's second generation DRG payment program as shown by Exhibit A–137 A.

139. DSHS contends that it was reasonable for DSHS to conclude from this fact that its rates under the second generation DRG payment program were adequate to meet the costs of economic and efficient hospitals. The results of the selective contracting program have played a role in DSHS's findings process on a continual basis. DSHS told HCFA in its April 16, 1990 submission that DSHS believes that "the rates which the State pays to hospitals that have agreed to contract at those rates under the State's hospital selective contracting program must be regarded as reasonable and adequate to meet the costs that must be incurred by those hospitals in treating Medicaid patients." (Ex. 439).

140. DSHS commenced the selective contract bidding process prior to the implementation of TN 88–8. DSHS asked hospitals in selective contracting areas to bid prices for treating Medicaid patients. Hospitals were not advised of their formula rates under the second generation system prior to submitting their bids. DSHS told hospitals in selective contracting areas that if their bids were unacceptable, they would lose non-emergency Medicaid patients to other hospitals in the selective contracting areas whose bids were higher. A comparison of price bids from hospitals in selective contracting areas to second generation formula prices shows that eighteen out of forty-five hospitals submitted bids lower than their second generation DRG formula prices. (Ex. 152).

141. In 1988, 22 hospitals entered into selective contracts with DSHS. (Ex. A–137 A). Eighteen of the contracting hospitals had contract prices equal to or lower than their second generation DRG formula prices at the time they entered into their initial contracts with DSHS. Some of these hospitals have never sought an upward adjustment to their contract rate, while others have obtained increases below the level of the MPPUF. As of March 1, 1991, there were 24 hospitals in the selective contracting program. All of these hospitals had contract prices that were equal to or below their formula prices. Five of the hospitals were disproportionate share hospitals that

received disproportionate share payments in addition to their contract prices.

142. DSHS believes that hospitals in selective contracting areas would not bid below their costs. Some hospitals, however, made their decision to enter into a selective contract to provide Medicaid services because of other factors such as their religious mission to serve the poor, the interests of medical staff, and potential loss in patient volume.

143. One of the state defendants' expert witnesses, Dr. Keith Leffler, an associate professor in the Department of Economics at the University of Washington, testified that the lack of competition among hospitals has led to excess costs and inefficient pricing. The selective contracting program is a method by which the State creates a competitive marketplace for hospitals, thereby promoting efficient pricing and cost control. In many cases, the bid prices of hospitals in the selective contracting program were below their actual costs.

144. It is reasonable for the State to consider the results of the selective contracting program in making its findings as to the reasonableness and adequacy of their formula rates. However, no conclusion can be drawn by the Court based on the results of the selective contracting program as to whether the second generation DRG payment rates meet the costs that must be incurred by economic and efficient providers under federal law. First, the selective contracting program is exempt from the Boren Amendment requirement that the State pay rates that meet the costs that must be incurred by economic and efficient providers. Second, the selective contracting program is run only in selective contracting areas. The selective contracting areas are the more urban, populated areas in the State. These areas have a higher concentration of hospitals than rural areas. The selective contracting program, which is based on creating a competitive environment, is effective only in such areas. It is unreasonable to draw inferences from the results of the selective contracting program and apply them to all Washington and border hospitals.

## 2. Negotiated Discounts With Third-Party Payors

145. Many Washington hospitals offer private insurers substantial discounts from charges. DSHS presented evidence of several discounts in the 35 to 50 percent range, with one as high as 67.9 percent.

146. The Hospital Commission collected information from hospitals on discounts offered to private third-party payors. The Hospital Commission data showed that the average discount in the State for all inpatient services was 5 to 7 percent off charges. Some hospitals in the State, such as Central Washington Hospital, do not offer discounts while others offer only minimal discounts from charges. For example, the largest discount Swedish Hospital has given to a private third-party payor is 7 percent. Other hospitals offer substantial discounts to third party payors. For example, St. Joseph Hospital gave Blue Cross a 67.9 percent discount during 1988 and a 51.8 percent discount in 1989. Pretrial Order, Admitted Fact 10. Providence Hospital of Everett gave a 38.8 percent discount to King County Medical Bureau in 1990.

147. It was reasonable for DSHS to consider the discounts given to private third-party payors in determining what rates must be paid for Medicaid services. However, it was not reasonable for the State to conclude based on a sampling of high discounts given by certain hospitals that the second generation DRG payment rates therefore meet the costs that must be incurred by economic and efficient providers under federal law.

## 3. Inefficiencies of Washington Hospitals and Unnecessary Costs and Inefficiencies of Plaintiff Hospitals

148. DSHS contends that its payment rates are reasonable and adequate because Washington hospitals are generally inefficient and continue to have opportunities for cost savings. DSHS points to certain inefficiencies at the plaintiff hospitals in particular as evidence that there is substantial room for enhanced productivity and efficiency among Washington and border hospitals.

### a. *Occupancy Rates and Excess Capacity*

149. Washington hospitals generally have excess inpatient bed capacity. According to a DSHS study, the average statewide occupancy rates for 1987, 1988 and 1989, based on percentage of available beds, were 56.77 percent, 56.44 percent and 56.43 percent, respectively. (Ex. A–355) American Hospital Association statistics show that Washington's occupancy rate, based on licensed bed occupancy, declined from 72 percent in 1980 to a little over 60 percent in 1989. For the same time period the United States occupancy rate declined from 75 percent in 1980 to 65 percent in 1989. Thus, the occupancy rate for Washington hospitals is lower than the national average and has declined at a greater rate than the national average.

150. Dr. Gerard Anderson, one of DSHS's expert witnesses, testified that the costs associated with excess beds in Washington are substantial. Dr. Anderson performed an excess bed study in which he estimated the number of excess beds in Washington and the costs associated with such excess beds. (Ex. A–479). For purposes of his study, Dr. Anderson defined an excess bed as a bed set up and staffed, and ready for use, for inpatients, which is not used on the busiest day of the year. Dr. Anderson concluded that in 1985, 33 percent of Washington's "statistical" beds,[10] calculated using AHA occupancy data, were excess beds. For 1988, 34 percent of statistical beds were excess beds. Using these percentages, Dr. Anderson calculated the costs of excess beds in Washington. He did this by multiplying the cost of an excess bed nationally by the number of excess beds in Washington. According to Dr. Anderson, the cost of an excess bed nationally in 1985 was $50,613; in 1988, $64,912. Using these figures, Dr. Anderson concluded that the total cost of excess beds in Washington for 1985 was approximately $164 million; for 1988, $193 million.

151. Dr. Anderson's excess bed study is seriously flawed in several respects and substantially overstates the number and cost of excess beds in Washington. Plaintiffs' expert witness, Dr. Mark Pauly, testified and the Court finds that Dr. Anderson's computer program used the wrong coefficient to calculate the number of excess beds, resulting in an overstatement of excess beds and costs. Dr. Pauly also testified that he has performed excess bed studies which show that the cost of an excess bed is approximately $20,000. Dr. Anderson's excess bed study did not take into account the beds used for outpatients or converted to other uses. For example, Dr. Anderson's study showed that in 1988 Central Washington Hospital had 43 excess beds out of 176 statistical beds, resulting in excess bed costs of $2.8 million for that hospital. In fact, Central Washington had converted those 43 beds to outpatient and other uses (Ex. 823), and, even more remarkable, its total operating expenses for 1988 were less than $2.8 million (Ex. 897). Dr. Anderson conceded that it makes no sense to have an estimate of excess bed costs greater than a hospital's total operating expenses. Dr. Anderson used the national cost of an excess bed in determining Washington's excess bed costs and, therefore, Washington's true excess bed costs could be substantially lower or higher than shown in his study.

152. The Court accepts Dr. Anderson's and Dr. Pauly's testimony that there are excess beds in Washington and that there are costs associated with such excess beds. However, due to inaccuracies in Dr. Anderson's data and methodology, the Court discounts his testimony and gives little weight to his testimony concerning the number of excess beds in Washington and the specific costs associated with such beds.

153. The evidence establishes that there are excess beds in Washington and that there are substantial costs to hospitals associated with such excess beds. It was

10. "Statistical beds" is an American Hospital Association term which means the average number of beds, cribs and pediatric bassinets regu- larly maintained (set up and staffed for use) for inpatients during the reporting period.

reasonable for the State to consider the levels of occupancy in Washington hospitals and the costs associated with excess beds in formulating the second generation DRG payment system.

### b. *Other Measures of Efficiency*

154. Washington hospitals are relatively efficient. Maurice Click, former Executive Director of the Washington State Hospital Commission, testified that Washington is below the national average and the Western Region average [11] in several key indicators of efficiency: (1) operating expenses per adjusted admission; (2) paid hours per adjusted admission; (3) number of beds per hospital, (4) beds per 1,000 population; and (5) average length of stay. Washington is above the national and Western region averages in outpatient revenue as a percentage of total income, indicating that Washington has high outpatient utilization. (Ex. 769). Washington's rate of increase in patient expenses for the years 1975 to 1988, adjusted for outpatient utilization, has been lower than the national average for seven of the thirteen years. (Ex. 358–A). For the two year period ending December 31, 1988, Washington hospitals' cost per case was 8.3 percent below the national average and 10.2 percent below hospitals in the Western Region. The Court found Mr. Click's testimony to be very credible and has given great weight to that testimony.

155. DSHS has presented substantial evidence showing that Washington hospitals, particularly plaintiff hospitals, have the ability to reduce costs. For example, Central Washington determined that it could save $833,000 by using housekeepers and volunteers to perform some functions currently performed by nurses. (Ex. A–585). Providence Hospital of Everett estimated that it could save $2.5 million by reducing staffing hours and replacing some registered nurses with licensed practical nurses and nurse extenders. Emanuel Hospital estimated that it could save $3.5 million in labor and non-labor costs through a combination of over 180 cost reduction

measures such as ceasing to provide protective clothing to employees who do not need it. (Ex. A–134). Several other examples of potential cost savings were presented by the State, most of which were in the $100,000 to $300,000 range.

156. Dr. Richard Tompkins, one of the State's expert witnesses, reviewed the discovery materials produced by five hospitals with good performance indicators and found inefficiencies at each hospital. The five hospitals he reviewed were Central Washington Hospital, St. Peter Hospital, Stevens Memorial Hospital, St. Joseph Hospital—Tacoma, and Swedish Hospital. Dr. Tompkins found, for example, that several hospitals had inefficiencies in operating expense management because they did not use a flexible budgeting system or cost accounting system. Several hospitals had no materials management programs or inadequate materials management programs. In most cases, the hospitals had inefficiencies in nursing labor force management, such as high nursing turnover rates, and excessive full time equivalents, benefits or salaries.

157. Although Washington hospitals generally have room for further improvements in productivity and efficiency, the evidence shows that Washington hospitals have made substantial efforts to be efficient and to cut costs where possible. Most of the plaintiff hospitals have implemented measures to recognize the potential cost savings that they have identified. Central Washington has always had a "best care, low cost" philosophy, and its costs relative to other hospitals in peer group B reflect the results of that policy. As of December 1987, Central Washington was in the 25th percentile for operating expenses per case mix adjusted value unit ("ACMVU"); in the 15th percentile for rate setting revenue per ACMVU; in the 8th percentile for routine care operating expenses per ACMVU; and in the 17th percentile for acute care operating expenses per patient day.

---

11. The Western Region includes hospitals in California, Oregon, Washington, Nevada, Montana, Utah, Colorado, New Mexico, Arizona, Idaho and Wyoming. (Ex. 769).

158. No hospital can eliminate all of its inefficiencies. Moreover, hospitals have little or no control over certain cost-influencing variables, such as case mix, number of admissions, treatment protocol, and input prices. Mr. Click testified that physicians control 70 to 75 percent of all hospital costs. In addition, certain costs must be incurred by hospitals to comply with state or federal laws and regulations, to meet accreditation and licensing standards, or to meet quality of care standards. For example, every hospital must comply with the universal precaution requirements established by the Federal Centers for Disease Control to control the risk of infection from the AIDS virus.

### c. *Certificate of Need Applications for Mergers*

159. To incur certain capital expenditures or make changes in service, Washington hospitals must obtain a Certificate of Need ("CON") under the State Health Planning and Resources Development Act (RCW 70.38). DSHS is the state agency charged with administering the CON program, and it decides whether or not to grant a CON. Until July 1, 1989, RCW 70.38.105(4) required hospitals to obtain a CON from DSHS for the following: (1) new facilities; (2) any capital expenditure that exceeds an established minimum or that substantially changes the hospital's services; (3) increases in bed capacity or redistribution of beds among identified services; (4) acquisition of major medical equipment; and (5) newly offered health services. DSHS promulgated detailed CON regulations (WAC 248–19) to carry out its statutory responsibilities and to apply statutory criteria. DSHS decisions to grant or deny a CON were based on the following criteria: need, financial feasibility, structure and process of care, and cost containment. WAC 248–19–360(1).

■■■ 160. In making its findings for TN 89–17, DSHS also considered Certificate of Need applications for mergers of Washington Hospitals. DSHS believed that the occurrence of mergers between hospitals in certain areas in the State showed that there was excess capacity and

duplication of services in Washington hospitals. The Court finds that it was reasonable for DSHS to conclude that there was excess capacity and duplication of services in certain areas where mergers took place. Nevertheless, it was not reasonable for DSHS to conclude, based on the occurrence of a few mergers, that its rates were reasonable and adequate to meet the costs that must be incurred by economic and efficient hospitals in the state.

## VIII. ADEQUACY OF PAYMENT RATES: COST–TO–PAYMENT ANALYSES

161. Several cost-to-payment analyses were submitted to the Court for purposes of showing the percentage of hospital costs covered by payments under the second generation system. The results of these comparisons varied greatly depending on the method used for calculating costs.

### A. *Exhibit 114—DSHS's April 1989 Draft Response to HCFA*

162. DSHS prepared a cost-to-payment analysis in April 1989 in response to HCFA's request for additional information on TN 88–8 (Ex. 114). This analysis was never submitted to HCFA. The analysis compared each facility's estimated costs for 1988 with projected reimbursement under TN 88–8. Costs were derived from Hospital Commission budget data and adjusted for case mix; payments were derived from applying the second generation DRG methodology. The cost-to-payment analysis showed that only approximately 4 percent of the hospitals would have their total costs paid under the second generation payment system. DSHS included in its analysis two marginal costs tests, one using 80 percent of total costs as a proxy for marginal costs, the other using 60 percent of total costs as the marginal costs proxy. The marginal cost analyses showed that approximately 20 percent of the hospitals would have 80 percent or more of their total costs paid, while 87 percent of the hospitals would have 60 percent or more of their total costs paid under the new system.

### B. Submissions to HCFA

163. The variable costs tests submitted to HCFA on May 12, 1989, November 22, 1989, and April 16, 1990, also contained total-cost-to-payment analyses. The total-cost-to-payment analyses in the variable costs tests showed that approximately thirty percent of the hospitals were having their total costs paid. Total costs for 1988 were estimated by applying the DRI Market Basket Index to 1985 base year costs. Since the actual rate of cost increases for Washington hospitals exceeded the DRI for this period, total cost estimates in these analyses were lower than actual hospital costs.

### C. Gross RCC Analysis

164. In April of 1991, DSHS prepared a cost-to-payment analysis for the period July 1, 1989 through June 30, 1990. (Ex. A–387). Costs were estimated using hospital-specific gross ratios of costs to charges (the "gross RCC method"), and applying them to hospitals' Medicaid charges for the relevant period as reported to DSHS. This analysis shows that 18.5 percent of the hospitals had their total estimated costs paid, 66.3 percent of the hospitals had 80 percent or more of their estimated total costs paid, and 97.8 percent had 60 percent or more of their estimated total costs paid.

### D. Cost-to-Payment Analysis Based on Costs in the Best Practices Model

165. One of plaintiff's expert witnesses, Steven Huebner, a partner at Arthur Anderson specializing in health care financing issues, prepared a cost-to-payment analysis for 1989 using the total cost data in Dr. Anderson's Best Practices Model. The total cost statistics in the Best Practices Model were derived from Medicare cost reports and adjusted for Medicaid specific case-mix. Mr. Huebner compared these costs to the total reimbursement figures in the Best Practices Model, which included patient participation and third-party payor contributions as well as payments under the State Plan. Mr. Huebner's analysis showed that the average total payment in 1989 was 80.9 percent of total hospital costs. (Ex. 954). Mr. Huebner's analysis further showed that hospitals were reimbursed for their full costs in 12.9 percent of Medicaid cases, for 80 percent or more of their costs in 36 percent of Medicaid cases, and for 60 percent or more of their costs in 97.4 percent of Medicaid cases. Most cases, 61.4 percent, were reimbursed at 60 to 80 percent of total costs. (Ex. 955). With respect to the number of hospitals having their costs paid, the analysis showed that 21.7 percent of rural, and 16.2 percent of urban, hospitals had all of their total costs paid; 47.8 percent of rural, and 40.5 percent of urban, hospitals had 80 percent or more of their costs paid; and 95.6 percent of rural, and 86.5 percent of urban, hospitals had 60 percent or more of their costs paid.

166. Mr. Huebner testified that the State's cost-to-payment comparison using the gross RCC to calculate costs overestimates the percentage of costs paid under the second generation system in many cases. He prepared an analysis which showed that the weighted average of percentage of costs paid using the gross RCC method was 90.5 percent, whereas the weighted average of percentage of costs paid using the cost calculation method in the Best Practices Model was 79.7 percent. (Ex. 957). The cost calculation method used in the Best Practices Model has a greater degree of accuracy than the RCC method.

167. The cost-to-payment comparisons demonstrate that there is little or no relationship between DSHS's methods for measuring efficiency and economy and the amount of costs reimbursed under the State Plan. DSHS has used several different measures of efficiency and economy both to set its second generation rates and to test the adequacy of those rates. The measures of efficiency and economy applied to Washington hospitals by DSHS include: (1) uncapped component costs in the base year; (2) total costs below the peer group median in the efficient and economic test; and (3) 85 percent licensed bed occupancy. There is no correlation be-

tween these measures of economy and efficiency and the amount of payment a hospital receives under the State Plan.

168. Both the gross RCC and the Best Practices Model cost-to-payment analyses showed that many uncapped hospitals were not having their total costs paid. Some examples are set forth in the following table, which shows the percentage of costs being paid under the State Plan depending on the test:

| Hospital | July 1, 1989- June 30, 1990 Gross RCC % | April 1, 1988- March 31, 1989 BPM % |
|---|---|---|
| Central Washington | 80.1% | 75.8% |
| Olympic Memorial | 91.6% | 70.5% |
| St. Joseph–Tacoma | 84.7% | 66.7% |
| Harrison Memorial | 87.0% | 81.9% |

169. Steven Huebner prepared a chart comparing the hospitals that had 100 percent or more of their costs paid under the second generation system to the various measures of efficiency and economy used by the State. (Ex. 958). That chart showed that the hospitals that had all of their costs paid generally did not meet any of the State's tests for economy and efficiency. Most of the twelve Washington hospitals that had all of their costs paid had base year component costs above the median and, therefore, had their costs capped under the methodology. About half of these hospitals were not hospitals designated "may be" economic in DSHS's efficient and economic test; that is, their total costs were above the peer group median. No hospital that had all of its costs paid had an 85 percent or higher occupancy rate. All but three of the hospitals had occupancy rates in 1989, based on percentage of licensed beds, below 40 percent.

170. As shown by Exhibit 955, under the State's Plan, 24 out of 46 rural hospitals and 22 out of 37 urban hospitals had less than 80 percent of their costs paid during the first year of the Second Generation DRG System. For 64 percent of the Medicaid cases during the same period, Washington hospitals received less than 80 percent of their costs.

171. The Court finds, based on a review of all the cost-to-payment analyses submitted in evidence, that Washington hospitals receive on the average approximately 80 percent of their costs under the second generation reimbursement methodology. The amount a hospital receives bears little or no relationship to DSHS's measures of efficiency and economy as expressed in the second generation payment methodology or the State's external tests.

## IX. DISPROPORTIONATE SHARE PAYMENTS TO BORDER HOSPITALS

172. Based on DSHS's interpretation of state law, DSHS did not make disproportionate share payments to out-of-state hospitals serving a disproportionate share of Medicaid patients. Plaintiff Emanuel Hospital, a disproportionate share hospital in Oregon, has not received any disproportionate share payments from DSHS. HCFA told DSHS in January 1991 that the State should have made provisions for border area hospitals from the beginning of the program. The State should and now intends to commence paying border hospitals disproportionate share payments.

173. There has been no evidence presented to indicate that the Medicaid reimbursement rates presently in place have adversely effected reasonable access to Washington hospitals as of the present time.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over this action under 28 U.S.C. § 1331 and 42 U.S.C. § 1396a(a)(13)(A).

■ 2. The burden of proof on procedural compliance with the Medicaid laws is on the plaintiffs. To be entitled to relief the plaintiffs must prove their factual claims by a preponderance of the evidence. *Folden v. Washington State Dept. of Social and Health Services,* 744 F.Supp. 1507, 1525 (W.D.Wash.1990).

■ 3. In reviewing the State's Medicaid plan, the Court must first determine whether the plan was prepared procedurally and substantively in compliance with the federal Medicaid Act and its implementing regulations. *Amisub,* 879 F.2d at 795. If the Court finds that the plan is in procedural and substantive compliance with federal law, the Court will limit its review to whether the agency's actions were arbitrary and capricious. *Id.; Mississippi Hospital Ass'n v. Heckler,* 701 F.2d 511, 516 (5th Cir.1983); *Mary Washington Hospital, Inc. v. Fisher,* 635 F.Supp. 891, 897 (E.D.Va.1985).

■ 4. In reviewing the State's Medicaid Plan, if the Court concludes that a state has failed to comply with the procedural requirements imposed by the Boren Amendment and regulations, a court may invalidate the State action without reviewing substantive compliance. *Amisub,* 879 F.2d at 799; *Wilder v. Virginia Hospital Ass'n,* — U.S. —, —, n. 18, 110 S.Ct. 2510, 2523 n. 18, 110 L.Ed.2d 455, 473–74, n. 18 (1990). This does not prevent a court from considering both procedural and substantive compliance at the same time. *Cf. Pinnacle Nursing Home v. Axelrod,* 928 F.2d 1306 (2nd Cir.1991) (it was error for district court to dismiss substantive compliance claim based on its granting of summary judgment in favor of nursing homes on procedural claim). Federal courts should be reluctant to invalidate a state plan for procedural noncompliance unless such noncompliance has also resulted in substantive violations of federal law. In this case the parties have presented evidence as to both procedural and substantive compliance of the State Plan. Thus,

the Court, having heard the evidence, can rule on both the procedural and substantive adequacy of the State's reimbursement rates.

## I. FEDERAL MEDICAID LAW—BOREN AMENDMENT

5. When the Medicaid Act was enacted in 1965, it required States to provide reimbursement for the "reasonable" cost of hospital services actually provided, measured according to standards adopted by the Secretary of the Department of Health, Education and Welfare.[12] Pub.L. No. 89–97, Sec. 121(a), § 1902(13)(B), 79 Stat. 346. Congress amended the Act in 1972 to give States more flexibility to develop methods and standards for reimbursement. The 1972 law required States to pay "the reasonable cost of inpatient hospital services ... as determined in accordance with the methods and standards which shall be developed by the State and reviewed and approved by the Secretary." Pub.L. No. 92–603, § 232(a), 86 Stat. 1410–1411. Although that Act in theory afforded States some degree of flexibility to adopt their own methods and standards for determining reimbursement rates, in fact, the regulations promulgated by the Secretary had essentially forced States to adopt Medicaid rates based on Medicare "reasonable cost" principles. *Wilder,* — U.S. at —, 110 S.Ct. at 2515–16, 110 L.Ed.2d at 465.

6. In response to rapidly rising Medicaid costs, Congress in 1981 extended the Boren Amendment, which had applied to nursing homes, to hospitals. Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, 95 Stat. 808; *Wilder,* — U.S. at —, 110 S.Ct. at 2515–16, 110 L.Ed.2d at 465. The Boren Amendment deleted the provision requiring States to reimburse hospitals on a reasonable cost basis and substituted a provision requiring States to reimburse hospitals at rates "that are reasonable and adequate to meet the cost which must be incurred by efficiently and economically operated facilities in order to

**12.** The Department of Health, Education and Welfare was the predecessor of the Department

of Health and Human Services.

meet applicable laws and quality and safety standards." S.Rep. No. 97–139, p. 478 (1981), U.S.Code Cong. & Admin.News 1981, pp. 396, 744. Thus, while Congress affirmed its desire that state reimbursement rates be "reasonable," it gave States greater flexibility in calculating those reasonable rates. *Wilder,* —— U.S. at ——, 110 S.Ct. at 2515–16, 110 L.Ed.2d at 465. Congress intended to afford States " 'greater latitude in developing and implementing alternative reimbursement methodologies that promote the efficient and economical delivery of such services.' " *Id.* (citing H.R.Rep. No. 97–158, Vol. 2, p. 293 (1981)). Congress informed States that they were free to adopt, for example, statewide or classwide rates, rates based on prospective costs, or payment plans that included incentives to encourage efficient operations. *Id.* (citing H.R.Rep. No. 97–158, Vol. 2, p. 292–93 (1981)). Since the Boren Amendment was enacted, most States have abandoned retrospective reimbursement plans that paid providers for the reasonable cost of the services actually provided, and have adopted plans that are prospective in nature, paying hospitals in accordance with the State's determination of what Medicaid care should cost. The Washington Medicaid Plan in this case is a prospective plan.

7. The Boren Amendment, codified at 42 U.S.C. § 1396a(a)(13)(A), provides that a State must reimburse providers according to rates that it "finds, and makes assurances to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards." The State must also find, and make assurances satisfactory to the Secretary, that individuals have "reasonable access" to facilities of "adequate quality."

8. The Medicaid Act does not define the terms "reasonable and adequate," "costs which must be incurred," or "efficiently and economically operated facilities," and the Secretary has refused to define such terms, concluding that States should determine the factors to be considered in determining what rates are "reasonable and adequate" to meet the costs which must be incurred by "efficiently and economically operated facilities." 48 Fed.Reg. 56049 (1983); *Wilder,* —— U.S. at ——, 110 S.Ct. at 2516, 110 L.Ed.2d at 465. The Medicaid Act, as modified by the Boren Amendment, has been the cause of significant litigation in many states. *See, e.g., Pinnacle Nursing Home v. Axelrod,* 928 F.2d 1306 (2nd Cir.1991); *West Virginia University Hospitals, Inc. v. Casey,* 885 F.2d 11 (3rd Cir. 1989), *aff'd on other grounds,* —— U.S. ——, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991); *Virginia Hospital Ass'n v. Baliles,* 830 F.2d 1308 (4th Cir.1987); *Mississippi Hospital Ass'n v. Heckler,* 701 F.2d 511 (5th Cir.1983); *Wisconsin Hospital Association v. Reivitz,* 733 F.2d 1226 (7th Cir.1984); *Nebraska Health Care Ass'n v. Dunning,* 778 F.2d 1291 (8th Cir.1985), *cert. denied,* 479 U.S. 1063, 107 S.Ct. 947, 93 L.Ed.2d 996 (1987); *Colorado Health Care Ass'n v. Colorado Dept. of Social Services,* 842 F.2d 1158 (10th Cir.1988); *Folden v. Washington State Dept. of Social and Health Services,* 744 F.Supp. 1507 (W.D.Wash. 1990); *Michigan Hospital Ass'n v. Babcock,* 736 F.Supp. 759 (W.D.Mich.1990); *Mary Washington Hospital, Inc. v. Fisher,* 635 F.Supp. 891 (E.D.Va.1985). The failure of Congress or the Secretary of Health and Human Services to define these critical terms has caused the States to expend millions of dollars in attempting to comply with these amorphous terms.

9. Whenever the State makes a change in its methods and standards, but not less often than annually, the State must make findings that its payment rates: (1) pay for inpatient hospital services through the use of rates that are "reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers to provide services in conformity with applicable State and Federal laws, regulations, and quality and safety standards;" (2) "take into account the situation of hospitals that serve a disproportionate number of low income patients with special needs;" and (3) "are adequate to assure

that recipients have reasonable access, taking into account geographic location and reasonable travel time, to inpatient hospital services of adequate quality." 42 C.F.R. § 447.253(b)(1)(ii). Although findings must be made at least annually, the State is required to submit assurances to the Secretary only when it makes a change in its payment methods and standards. 42 C.F.R. § 447.253(a).

10. The role of the Secretary of the Department of Health and Human Services under the Medicaid regulations is limited. The Secretary reviews only the reasonableness of the assurances provided by a State and not the State's findings themselves. 42 C.F.R. § 447.256(a)(2). Thus, the Secretary does not require States to submit the findings or underlying data. The Secretary may, however, request a State to provide additional background information if he believes it is necessary for a complete review of the State's assurances. 48 Fed. Reg. 56050 (1983). Plaintiffs also challenge the federal defendants' approval of the Washington Plan. These issues were not litigated in the recently concluded trial and have been reserved for further proceedings.

## II. WASHINGTON MEDICAID PLAN'S COMPLIANCE WITH PROCEDURAL REQUIREMENTS OF FEDERAL LAW AND REGULATIONS

11. The Medicaid Act and implementing regulations require the State to follow two procedures whenever a new State Medicaid plan is instituted. First, the State must engage in a "finding" process to ensure that its rates meet the requirements of federal law, including the requirement that its rates are reasonable and adequate to meet the costs that must be incurred by economically and efficiently operated providers. Second, the State must supply HCFA with assurances that all federal requirements have been met, including the "efficiency and economy" requirement. *Amisub*, 879 F.2d at 796.

12. Federal Medicaid law requires the State, at a minimum, to make "findings" which identify and determine (1) efficiently and economically operated hospitals; (2) the costs that must be incurred by such hospitals; and (3) payment rates that are reasonable and adequate to meet the costs that must be incurred by the State's efficiently and economically operated hospitals. *Id.* The State of Washington contends that it is not possible to follow the *Amisub* holding and identify efficiently and economically operated providers. State's counsel argues that "the Amisub court's formulation of the Boren Amendment standard misstates the statutory standard." This Court rejects the State's position in this regard and concludes that federal law requires states to identify and determine such facilities. *Id.; Folden*, 744 F.Supp. at 1532; *Pinnacle*, 928 F.2d at 1314. *Cf. Wilder*, — U.S. at —, 110 S.Ct. at 2522, 110 L.Ed.2d at 473 (Boren Amendment requires State to judge the reasonableness of its rates against the objective benchmark of an "economically and efficiently operated facility").

13. Federal law does not require the State to *define* what an economically and efficiently operated facility is, but it does require the State to *identify* and *determine* such facilities. *Folden*, 744 F.Supp. at 1532. The State's identification and determination of economically and efficiently operated facilities may be implicit in the State's methods and standards. *Id.*

14. While the State is free to create its own method for arriving at the required findings, this does not absolve the State from making the required findings. *Amisub*, 879 F.2d at 797. "Mere recitation of the wording of the federal statute is insufficient for procedural compliance." *Id.* The State must engage in a bona fide finding process before it submits its assurances to HCFA.

15. The Boren Amendment requires the State, in making its findings, to judge the reasonableness of its rates against the objective benchmark of an "efficiently and economically operated facility." *Wilder*, — U.S. at —, 110 S.Ct. at 2522, 110 L.Ed.2d at 473.

16. The findings process does not require any special studies or written findings. *Folden*, 744 F.Supp. at 1532; *Mary Washington*, 635 F.Supp. at 897. It is sufficient if the State has considered, on the basis of some reasonably principled analysis, whether its payment rates meet the substantive requirements of the Boren Amendment. *Folden*, 744 F.Supp. at 1532. Nevertheless, the State's findings are not proper if the findings process, rather than being bona fide and objective, is merely an exercise to make the best case to support the State's rates, and the State considers only factors favorable to its position while failing to consider relevant factors that are unfavorable. *Folden*, 744 F.Supp. at 1534; *California Hosp. Ass'n v. Schweiker*, 559 F.Supp. 110, 117 (C.D.Cal.1982), *aff'd without opinion*, 705 F.2d 466 (9th Cir.1983). The Court's task is to determine whether there was a reasonable factual basis to support DSHS's findings and assurances that, under the State's Medicaid plan, the efficiently and economically operated hospitals are reasonably and adequately reimbursed for the costs they must incur. *Amisub*, 879 F.2d at 800.

17. DSHS's determination of procedural and substantive compliance with federal law is not entitled to the deference afforded a federal agency. *Id.* at 795–96. Nevertheless, in reviewing the nonadjudicatory decisions and actions of DSHS in adopting and administering the Medicaid plan, the standard of review is highly deferential, presuming the agency action to be valid if a reasonable basis exists for its decision. *Id.* at 800 (citing *California Hosp. Ass'n*, 559 F.Supp. at 116). The Court is still obliged, however, to engage in a substantial inquiry. The presumption of validity "is not to shield [the agency's] action from a thorough, probing, indepth review." *Amisub*, 879 F.2d at 800 (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)). The Court must determine whether the agency action was based on a consideration of all the relevant factors and whether there has been a clear error of judgment. *Amisub*, 879 F.2d at 800 (citing *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823–24).

### A. *Findings Implicit in the Methodology*

18. Plaintiffs contend that DSHS failed to make the required *Amisub* findings because it did not objectively identify and determine efficiently and economically operated hospitals, costs that must be incurred by such hospitals, and reasonable and adequate payment rates. The State has contended that these findings are implicit in the second generation payment methodology, and that the design of the payment system was the basis for the State's finding that the payment rate met the requirements of the Boren Amendment. At trial, the State admitted that the second generation payment system does not identify and determine economically and efficiently operated hospitals. Rather, the State contended that it identifies and determines hospitals that "may be" economic and efficient through the use of a methodology that applies "relative measures of efficiency and economy," such as capping at the peer group median, limiting capital expenses to the 1985 base year level, and inflating capped operating and medical education expenses by the MPPUF. Similarly, the State contends its payment methodology does not identify costs that must be incurred by economic and efficient hospitals; it identifies a range of costs that may have to be incurred by hospitals that "may be" economic and efficient. Based on the rate setting methodology alone, there is no "objective benchmark" of an efficiently and economically operated facility by which the State could judge the adequacy of its payment rates, and hence no reasonably principled basis on which the State could make its finding that the rates were reasonable and adequate to meet the costs that must be incurred by economically and efficiently operated facilities.

19. The Boren Amendment requires the State, in making its findings, "to judge the reasonableness of its rates against the objective benchmark of an 'efficiently and economically operated facility.'" *Wilder*, —— U.S. at ——, 110 S.Ct. at 2523, 110

L.Ed.2d at 473. The State has failed to identify any objective benchmark and none is implicit in the State Plan. A "state must articulate 'a rational connection between the facts found and the choice made.'" *Colorado Health*, 842 F.2d at 1167 (quoting *Baltimore Gas and Electric Co. v. Natural Resources Defense Fund*, 462 U.S. 87, 105, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983)). The record in this case is blatantly void of any effort by the State to make the federally mandated findings. The State has provided no evidence to support a findings process other than budgetary considerations. While budgetary constraints must necessarily be considered by States, budgetary constraints alone can never be sufficient. "If a state could evade the requirements of the [Medicaid] Act simply by failing to appropriate sufficient funds to meet them, it could rewrite the congressional imposed standards at will." *Alabama Nursing Home Ass'n v. Califano*, 433 F.Supp. 1325, 1330 (M.D.Ala.1977).

20. The State's argument that the rate setting methodology alone provides an adequate basis for the findings that the rates meet the requirements of the Boren Amendment must also fail. While the identification and determination of economically and efficiently operated hospitals may be implicit in the rate setting methodology, the State cannot base its finding as to the reasonableness and adequacy of its payment rates on the rate setting methodology alone. This would result in circular reasoning. In this case, the payment rates set by the methodology are tied to the State's own determination of what it was willing to pay. DSHS set limits on costs and used such limits to determine efficiently and economically operated hospitals and the costs such hospitals must incur. The State's payment methodology pays in accordance with these limits. To say that the State's finding that its rates are reasonable and adequate is implicit in the methodology is to say that the rates are reasonable and adequate because they pay the costs that the State has determined it should pay. The fallacy of the State's argument is illustrated by a simple example. Assume the State determined that every hospitals' base rate for Medicaid payments would be 50 percent of its total Medicare allowable costs for the previous year. An efficiently and economically operated facility is implicitly identified in such a plan as a hospital whose total costs come in at or below 50 percent of its previous year's costs. The costs which must be incurred by such hospitals are implicitly defined in the plan as costs at or below the same 50 percent level. Since the plan pays in accordance with its own methodology, it would pay (according to the State) the "costs that must be incurred" by "economically and efficiently operated providers," as identified in the plan. This circular reasoning cannot support a state plan.

21. It was unreasonable for the State to base its finding as to reasonableness and adequacy of its rates under the Boren Amendment on its own rate setting methodology. The State must have some other reasonably principled basis on which to find that its rates were reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers.

B. *Findings Based on Factors Outside the Methodology*

22. The Court must consider next whether the State had some other reasonably principled basis on which to conclude that its payment rates meet the requirements of federal law. DSHS contends that its findings and assurances for TN 88-8, TN 88-11, and TN 89-14 that the Boren Amendment requirements were met were based on several other factors: (1) the reasonableness of the relative measures of efficiency and economy used to establish the rates, and (2) the results of the selective contracting program. For its findings in connection with TN 89-17, DSHS relied on several additional factors: (1) evidence obtained through discovery showing the inefficiencies of plaintiff hospitals, (2) information concerning discounts given to private third-party payors, (3) cost reports pertaining to Washington hospitals, (4) Certificate of Need applications for mergers,

and (5) external tests developed to test the adequacy of the rates.

### C. *Reasonableness of Adopting Rate Components*

23. The plaintiffs allege a lack of findings or supporting reasons to justify the State's selection of the various rate components in the second generation DRG system. Plaintiffs challenge specifically the State's use of the Hospital Commission's peer groups, capping component costs at the median, using MPPUF as the inflator for operating and medical education costs, and freezing capital expenses at 1985 levels. No one factor should determine the reasonableness of the State Plan. The court must look at the overall Plan and the resulting rates established under the Plan to determine compliance with federal law.

Peer groups

24. The Court concludes that DSHS had a reasonable basis for using the Hospital Commission's peer groups in its rate setting methodology. The record evidences that DSHS conducted an examination of various peer group options before it adopted the Hospital Commission groupings. Although Peat Marwick had advised the State of deficiencies in the peer groupings, Peat Marwick ultimately recommended that that the State adopt the peer groups for purposes of comparing similar hospitals. The plaintiffs argue that DSHS should have taken other factors into account in developing the peer groups such as urban/rural and wage differentials. While the State could have considered these factors, it was not required to do so. "Relatively imprecise groupings or classifications are almost unavoidable in a large public health and welfare program such as Medicaid, and imprecisions may certainly be justified by the difficulty of developing a more precise system." *Mary Washington Hospital*, 635 F.Supp. at 899.

Capping Component Costs at the Median

25. The Court concludes that DSHS did not have a reasonable basis for capping component costs at the median. At the time DSHS adopted the median as

its ceiling, it believed that HCFA had approved this standard in other states and the courts had accepted the median as a standard of relative efficiency. This, together with budgetary constraints, served as the basis for DSHS's decision to cap component costs at the actual 1985 median for each peer group. DSHS did not consider any factors relevant to meeting the economy and efficiency requirement of the Boren Amendment, including whether the capping of each component would result in rates that would be adequate to pay the costs that had to be incurred by economic and efficient providers in Washington. The State chose this measure of relative efficiency without considering whether it had any relevance whatsoever to efficient and economic hospital operations in this state. The State also ignored, or failed to investigate further, evidence of the serious impact capping had on certain hospitals. Moreover, while the adoption of the Hospital Commission's peer groups was proper under the circumstances, DSHS knew that the peer groups had a number of methodological weaknesses that limited their effectiveness for cost comparison purposes. Given this knowledge, DSHS was required to make some factual inquiries as to the impact of using the median caps and its effect on the economy and efficiency requirement of the Boren Amendment.

Freezing Capital Expenses

26. The State's decision to freeze capital at 1985 peer group median levels was reasonably based on a consideration of several relevant factors. The State chose not to inflate capital because it knew that Washington hospitals had excess beds and it also knew that it had previously reimbursed hospitals for capital expenses that were never actually incurred. Moreover, the State made provisions in its plan for making adjustments to capital, if necessary, during the rebasing process.

MPPUF

27. DSHS's adoption of the MPPUF was not based on a consideration of relevant factors. Rather, the use of

MPPUF in the second generation DRG system was driven solely by the State's desire to meet budgetary targets. There was no factual basis to support DSHS's choice of the MPPUF as the retrospective and prospective inflation factor in its payment methodology. DSHS conducted no investigation and made no inquiry as to whether MPPUF was a reasonable Medicaid inflation factor for Washington hospitals. DSHS also failed to consider whether the discretionary adjustments made to the DRI Market Basket Index by ProPAC to arrive at the recommended MPPUF had any relevance or application to Washington hospitals. The MPPUF factor necessarily plays a significant role in the overall adequacy of the State's rates. The State's selection of 1985 as the base year and decision to inflate certain 1985 base year costs by MPPUF resulted in a 2.9 percent inflation factor for the entire period 1985 to 1988. During the same period Washington hospitals had in fact experienced a 17.7 percent rate of inflation. (Ex. 803).

### Adoption of Overall System

28. At the time DSHS implemented the second generation DRG system, it had not made any of the required federal findings. DSHS admits that it did not determine or identify economically and efficiently operated providers or the costs that such providers must incur. The evidence establishes that DSHS's adoption of the second generation system was driven solely by the need to meet established budget targets. While a state Medicaid agency may consider budgetary constraints, budgetary constraints cannot excuse noncompliance with federal Medicaid law. *Amisub*, 879 F.2d at 800. DSHS argues that it adopted MPPUF, as well as the other rate components, in order to encourage cost containment and to foster greater efficiency among Washington and border hospitals. These are legitimate purposes which are consistent with the intent of the Boren Amendment. Congress, in enacting the Boren Amendment, intended to increase considerably the flexibility state agencies have to develop payment systems that encourage cost containment and efficiency.

*Colorado Health Care*, 842 F.2d at 1165. The Boren Amendment frees States from reimbursing hospitals on the basis of their *actual* costs, and permits States to develop payment systems based on valid estimations of what hospital costs should be. Nevertheless, payment rates must be reasonable and adequate to meet the costs that must be incurred by economically and efficiently operated providers under federal law. The State cannot measure its payment rates against the Boren Amendment standard unless it has a sufficient factual understanding of the economy and efficiency of its hospitals and the costs such hospitals must incur. The latitude the Boren Amendment grants States is the flexibility "to determine what methods and factors will produce rates adequate in fact given the circumstances particular to each State's hospitals." *Virginia Hosp. Assn. v. Bal-iles*, 868 F.2d 653, 659 (4th Cir.1989). The flexibility given the States is not intended to encourage or permit arbitrary reductions in payments.

### D. *Selective Contracting Program*

29. It was reasonable for the State to consider its selective contracting program in determining whether payment rates were reasonable and adequate to meet the costs that must be incurred by economically and efficiently operated facilities. Nevertheless, the results of the selective contracting program, whether considered alone or in conjunction with other factors considered by the State in its formulation of the second generation DRG system, do not provide a sufficient factual basis for the State's finding and assurance that the payment rates satisfied the Boren Amendment requirements.

### E. *Additional Findings*

30. The State argues that even if it did not make the proper findings under *Amisub* when it adopted the second generation DRG system, the Court must find that it met the procedural requirements of the Boren Amendment because it subsequently made the proper findings. The State also argues that under the Eleventh Amendment and the principles set forth in

*Green v. Mansour,* 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985), this Court is limited in its determination of the State's procedural compliance with the Boren Amendment to a consideration of the State's most recent findings adopted in late 1990. The Court need not decide this issue, however, because the Court finds and concludes that the State has never made the proper findings in connection with the second generation DRG system. Assuming *arguendo* that the State is correct and this Court may consider only the State's most recent findings, the Court concludes that the State failed to comply with the procedural requirements of the Boren Amendment. The State contends that it made annual findings in November and December of 1990, that its second generation payment rates met the requirements of the Boren Amendment. At that time, DSHS considered, in addition to all previously considered factors, (1) evidence obtained through discovery showing the inefficiencies of plaintiff hospitals, (2) information concerning discounts given to private third-party payors, (3) cost reports pertaining to Washington and border hospitals, (4) Certificate of Need applications for mergers, and (5) the results of the marginal cost and economy and efficiency tests that were submitted to HCFA on November 22, 1989 and April 16, 1990. As explained in the Findings, the Court concludes that these factors do not provide a reasonable basis for the State's finding that its payment rates meet the costs that must be incurred by economically and efficiently operated providers.

31. In conclusion, the State failed to make the findings required by *Amisub,* and there was no reasonable factual basis to support the State's findings and assurances that the payment rates are reasonable and adequate to meet the costs that must be incurred by economically and efficiently operated providers.

32. On July 16, 1990, HCFA approved the "assurances" relating to TN 88–8 and its subsequent amendments. HCFA is not required to thoroughly analyze the State's findings. Notwithstanding HCFA's approval, the Court finds and concludes that the overwhelming evidence does not support the State's procedural compliance with federal law. This Court therefore holds that the Washington Medicaid Plan, TN 88–8 and its subsequent amendments, is in violation of the procedural provisions of the federal Medicaid laws.

33. Based on the Court's analysis of the governing federal law and the evidence at trial, the Court concludes that the State did not comply with the procedural requirements of 42 U.S.C. § 1396a(a)(13)(A).

III. WASHINGTON MEDICAID PLAN'S COMPLIANCE WITH SUBSTANTIVE REQUIREMENTS OF THE BOREN AMENDMENT

34. The plaintiffs also challenge the substantive adequacy of the payment rates under the second generation DRG system, claiming that they are not in fact reasonable and adequate to meet the costs that must be incurred by economically and efficiently operated providers. The State contends that even if it did not comply with the procedural requirements of the federal Medicaid law, its rates are nevertheless in substantive compliance with federal law and must therefore be approved.

35. Where the State has violated the procedural requirements of the Boren Amendment by failing to provide an objective benchmark by which to judge the substantive adequacy of the State's Medicaid reimbursement rates, the burden of proof as to substantive compliance with the Boren Amendment should shift to the State. Otherwise, the Court and the plaintiffs are left with the task of doing what the State was required to do under federal law: identify and determine efficiently and economically operated facilities and the costs they must incur.

36. The Boren Amendment does not prescribe any precise rate or percentile of Medicaid reimbursement. *Folden,* 744 F.Supp. at 1529. Medicaid payment rates are reasonable and adequate within the meaning of the Boren Amendment if they fall within a zone or range of reasonableness. *Colorado Health Care,* 842 F.2d at

1167; *Wisconsin Hosp. Ass'n*, 733 F.2d at 1233; *Folden*, 744 F.Supp. at 1529. The range of reasonableness doctrine recognizes that rate making is an inexact science and that rate making agencies must be allowed "a substantial spread between what is unreasonable because too low and what is unreasonable because too high." *Folden*, 744 F.Supp. at 1529–30 (quoting *Federal Power Commission v. Conway Corp.*, 426 U.S. 271, 278, 96 S.Ct. 1999, 2004, 48 L.Ed.2d 626 (1976) (quoting *Montana–Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251, 71 S.Ct. 692, 695, 95 L.Ed. 912 (1951)). The allowable "spread" for Medicaid rate payments is especially broad because of Congress's intent in enacting the Boren Amendment of conferring greater flexibility on the state agencies. *Folden*, 744 F.Supp. at 1530.

37. In determining the lower limit on payments established under the Boren Amendment, it must be recognized that the Boren Amendment eliminated the requirement that States reimburse hospitals in accordance with Medicare reasonable cost principles. The amendment requires instead that Medicaid payments be reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated facilities.

■ 38. Congress intended to increase considerably the flexibility state agencies have to develop payment systems that encourage cost containment and efficiency. *Colorado Health Care*, 842 F.2d at 1165. The legislative history of the Boren Amendment makes plain that while States have considerable freedom to structure their reimbursement programs to encourage and maintain efficiency, the programs must produce rates related to the economical provider's reasonable costs. *Baliles*, 868 F.2d at 659 n. 5. The Boren Amendment's legislative history notes that although the Committee recognized that economic constraints and the need for reductions in federal funds for Medicaid required that States be given flexibility to improve the Medicaid reimbursement mechanism, "the Committee does not want such policies to result in arbitrary and unduly low reimbursement levels for hospital services." H.R.Rep. No. 158, 97th Cong., 1st Sess., 293–94 (1981). "In permitting States greater flexibility in reimbursement system design, the Committee intends the States to ensure that such alternative systems provide fair and adequate compensation for services to Medicaid beneficiaries.... The Committee believes that hospitals should be paid for the cost of their care to Medicaid patients in the most economical manner." *Id.*

■ 39. For purposes of determining whether the State's rates fall within the range of reasonableness, it is the entire reimbursement payment taken as a whole that is relevant, not the particular components that comprise the rate. *Folden*, 744 F.Supp. at 1535 (citing *Colorado Health Care*, 842 F.2d at 1167).

40. DSHS argues that a reasonable interpretation of the term "costs which must be incurred" as used in the Boren Amendment means "marginal," "variable" or "incremental" costs (collectively "marginal" costs). The State's position is that its payment rates meet the costs that must be incurred by efficiently and economically operated hospitals if they cover the marginal costs of such hospitals. The State has not specifically determined the marginal costs of efficiently and economically operated hospitals but has used in one test (the variable cost test in Exhibit 439) the peer group variable cost percentages of 20 percent, 35 percent and 50 percent as proxies for marginal cost, and in another test (the Gross RCC test in A–387) 60 percent of total costs as the proxy for marginal costs. The State has not identified any economically and efficiently operated facilities against which to test its marginal cost theory, but claims that no such identification is necessary because under its strictest marginal cost test all but two hospitals have their marginal costs met. The State does not point to any legal decision which holds that a state can satisfy the Boren Amendment requirements with a payment level equal to marginal costs of participating hospitals.

41. There is no legal support for the State's argument that it need only pay marginal costs to satisfy Boren Amendment requirements. The Court rejects the State's marginal cost theory and holds that the Boren Amendment requires a state to pay both marginal and fixed costs that must be incurred by economically and efficiently operated providers. Nothing in the Boren Amendment speaks solely in terms of marginal costs. Moreover, the State has not identified, and this Court has not found, anything in the legislative history of the Boren Amendment to suggest that "costs which must be incurred" refers only to the marginal or incremental costs which must be incurred by hospitals to provide services to a Medicaid patient. A State's interpretation of federal law is not entitled to the deference afforded a federal agency. *Amisub*, 879 F.2d at 795–96.

42. The record in this case also casts doubt on the validity of the State's marginal cost theory. The uncontroverted evidence at trial establishes that all hospitals, including economically and efficiently operated hospitals, must incur fixed costs in treating Medicaid patients. Representatives from several hospitals with stable Medicaid population levels testified that they would not have to acquire as many beds and as much equipment if they did not treat Medicaid patients. Medicaid patients, like other patients, use the fixed assets of hospitals. Thus, payment rates must reimburse hospitals for the necessary fixed *and* marginal costs that must be incurred by economic and efficient providers in providing Medicaid services in conformity with state and federal laws and quality of care standards[13]. Dr. Eastaugh, a State expert witness, admitted that states should pay more than marginal costs.

43. The Court also rejects the results of the State's marginal costs tests because the proxies for marginal costs were arbitrarily selected. The evidence shows that the State's marginal cost tests were not based on an objective investigation or reasonably principled analysis of the costs that must be incurred by economically and efficiently operated providers, but rather were merely efforts to make the best case to justify the State's rates. These tests fail to justify the reimbursement rates contained in TN 88–8 and its later amendments.

44. The Boren Amendment does not require a state to pay all costs incurred by its hospitals or even all reasonable costs. Congress, in adopting the Boren Amendment, clearly intended to promote a more cost efficient Medicaid scheme. *Baliles*, 868 F.2d at 659. Although States must therefore be given broad discretion to create their own reimbursement program, they may not provide a reimbursement plan which fails to pay all fixed as well as variable costs that must be incurred by an efficiently and economically operated health care provider providing services to Medicaid patients. The States are not, however, required to pay a rate that includes profit or a return on investment.

45. The State offers the efficient and economic test as further evidence that its rates are reasonable and adequate under the Boren Amendment. The Court rejects the results of the efficient and economic test because the measures of economy and efficiency were arbitrarily selected, without any examination of their relationship to costs that must be incurred by economically and efficiently operated hospitals in Washington.

46. The State selected 85 percent licensed bed occupancy as its measure of efficiency without considering its relevance to the economic and efficient operations of Washington hospitals. The State's decision to use the Hospital Commission fixed-to-variable cost ratios to adjust total costs in

---

13. The Court is not suggesting that the State Medicaid program must reimburse hospitals for *all* fixed and marginal costs they incur. Rather, the Court concludes that the State must reimburse economic and efficient hospitals for the fixed and variable costs they must incur as a result of treating Medicaid patients in conformity with state and federal laws, and quality of care standards. Reimbursement for variable costs only does not pay economic and efficient providers for all of the costs they must incur in treating Medicaid patients.

this test also lacked a rational factual basis. The State knew at the time it selected 85 percent licensed bed occupancy as an adjustment factor that it did not account for the fact that many Washington hospitals had converted a portion of their licensed inpatient beds to outpatient or other uses. The State also knew that many of the State's rural hospitals had occupancy rates significantly below the state average. The State did not consider whether 85 percent licensed bed occupancy was a rational measurement of the efficiency of rural hospitals. In fact, rural hospitals suffered the most under the economy and efficiency test because 80 percent of their costs were deemed fixed under these arbitrary ratios, the largest percentage of any peer group, and such costs were significantly reduced as a result of occupancy rates far below the 85 percent standard. For example, for Lincoln Hospital, a rural hospital with a licensed bed occupancy rate of 10.76 percent in 1988 and the lowest cost hospital in the state, the effect of adjusting its fixed costs (arbitrarily determined at 80 percent of total costs) by an 85 percent licensed bed occupancy percentage was to reduce its total estimated Medicaid costs from $47,746 to $14,386. (Ex. 439, Ex. B, p. 1). Thus, under the efficiency and economy test, approximately 70 percent of Lincoln's estimated total Medicaid costs were deemed unnecessary and nonreimburseable under the State's Plan.

47. The economy and efficiency test, like the marginal cost tests, was not based on any rational interpretation or understanding of the economy and efficiency of Washington hospitals. Rather, it was created by the state to justify the State's reimbursement rates under the second generation DRG system.

48. The cost-to-payment analyses provided by expert testimony demonstrate that the average Medicaid reimbursement for Washington hospitals for 1989 was approximately 80 percent, with the range of reimbursement from 50 percent to 175 percent. (Ex. 954). For the year 1989, 61 percent of all Washington Medicaid cases were reimbursed at 60 to 80 percent of their total costs. (Ex. 955). The amount of reimbursement bears little or no relationship to the "relative measures" of economy or efficiency in the State's external tests or to the hospitals' occupancy rates.

49. The Court's task in determining whether the payment rates meet the substantive requirements of the Boren Amendment is limited to a determination of whether the overall rate produces payments that fall within a zone of reasonableness. Under certain circumstances, it is possible that a statewide reimbursement program which pays hospitals on the average for 80 percent of their Medicaid costs could satisfy the requirements of the Boren Amendment and fall within a range of reasonableness. However, without the objective benchmark of an efficient and economic hospital, and proper State findings as to the costs they must incur, the State has failed to establish by credible evidence that the State Plan pays rates that meet the costs that must be incurred by economically and efficiently operated hospitals under federal law. State witnesses have admitted that they have no independent rational basis to support their contention that the rates satisfy the substantial requirements of federal law. Accordingly, the Court concludes that the State has failed to prove by a preponderance of the evidence that the Washington Medicaid Plan, TN 88–8 and its subsequent amendments, is in substantive compliance with federal Medicaid law.

50. The Court has previously concluded that where the State has failed to comply procedurally with the Boren Amendment, the burden of proof as to substantive compliance should shift to the State. Even if this Court concluded that plaintiffs who have successfully met their burden of proof as to procedural compliance continue to have the burden of proof to establish a substantive violation of the Medicaid laws, plaintiffs have met their burden in this case.

51. Although the Boren Amendment does not require payment of a hospital's total costs, evidence of total costs is relevant. According to plaintiff's expert witness Huebner, as shown in Finding of Fact

114 and footnote 9, only 3 percent of all Washington hospitals have their actual costs paid based on an analysis using Exhibit 439. Exhibit 114, a State draft response to HCFA, prepared in April 1989, estimated that approximately 4 percent of all hospitals would have their actual costs paid during the first year of the State Plan. Using the State's data contained in Dr. Anderson's Best Practices Model, as shown by Finding of Fact 165, Mr. Huebner's analysis indicates that hospitals are reimbursed for their total costs in only 12.9 percent of all Medicaid cases under the new plan. Mr. Huebner's analysis of the cost data in Thomas Johnson's affidavit, Exhibit 423 A, submitted to this Court in April 1990, showed that 18 percent of hospitals would have their total costs paid. Finally, as shown by Exhibit 955, Washington hospitals received 80 percent or less of their actual costs in 73.6 percent of all Medicaid cases during the first year of the State's new plan. The Court finds these estimates to be reliable and to provide some evidence that efficiently and economically operated Washington hospitals are not being reimbursed for the costs they must incur.

52. The range of reimbursement under the State Plan is wide. Under the State's methodology, being an "uncapped" hospital means that the hospital's base year costs in 1985 were reasonable and should be reimbursed, adjusted for MPPUF. Yet, St. Joseph Hospital of Tacoma, an uncapped peer group C hospital with an estimated licensed bed occupancy of 69.66 percent, and also an "economic" hospital under the State's economy and efficiency test, is reimbursed on the average 66.7 percent of its Medicaid costs, using the cost-to-payment analysis derived from the State's Best Practices Model. (Exs. 20, 439 and 954). The State's gross RCC cost-to-payment analysis shows St. Joseph's reimbursement at 84.7 percent of its Medicaid costs. (Ex. 957, p. 2). On the other hand, Columbia Basin Hospital, a capped peer group A hospital with a 4 percent licensed bed occupancy rate, which was not an "economic" hospital under the State's economy and efficiency test, is reimbursed at 175 percent of costs, using the Best Practices Model comparison of costs

to payments. (Exs. 20, 439 and 954). The gross RCC analysis shows Columbia Basin having 147 percent of its costs reimbursed. While these examples alone are insufficient to show that efficiently and economically operated facilities are not having their reasonable costs met, they demonstrate the inconsistent and irrational results of the State's payment system. These results are the natural consequences of the State's failure to make the appropriate findings when it formulated the second generation DRG payment methodology.

53. The Court has previously concluded that various components of the second generation reimbursement plan, TN 88–8 and its subsequent amendments, were arbitrarily selected. These components include the exclusion of outliers from the 1985 base year costs, the capping of component costs at the median in the base year, the use of MPPUF, and the failure to pay costs that must be incurred in outlier cases. Although a court may not determine substantive compliance based on a single component of the Plan, where numerous significant components are improperly selected, the Court may consider the overall effect on the resulting reimbursement rate.

54. The State Plan was devised to reduce Medicaid payments in Washington by approximately 11.6 percent or a total of over $11,000,000 during the first year of the Plan. The Plan has been successful in reducing Medicaid payments since its inception. The State failed to consider whether these reductions could be justified under federal law. The State has failed to articulate any rational connection between the requirements under the Boren Amendment and the rates selected.

55. Plaintiffs have submitted substantial evidence in support of their contention that the State's Plan failed to substantially comply with federal law. The evidence establishes that there are Washington hospitals which are efficiently and economically operated that do not have their necessary costs paid under the State Plan. The State has provided the Court with no credible evidence that the actual payments made to Washington hospitals under the new plan

will reimburse Medicaid providers for such necessary costs. The Court concludes from all the evidence presented at trial that the adoption of the overall plan, in particular the capping of component costs at the median, the exclusion of outlier cases from the base year costs, the provisions for the payment of outlier cases and the use of MPPUF as an inflation factor for the Plan, results in many Washington hospitals not being reasonably and adequately compensated under the State Plan. The Court finds and concludes that there are Washington hospitals that are efficiently and economically operated which will not be reasonably and adequately compensated under the State Plan for the costs they must incur, as required under 42 U.S.C. § 1396a(a)(13)(A).

56. The plaintiffs have established by a preponderance of the evidence that the State Plan is in violation of the substantive provisions of the federal Medicaid law. Further, the Court holds that the State's findings and assurances that its rates were substantively adequate had no reasonable factual basis, and that the State's adoption of its Plan was arbitrary and capricious and contrary to law. *Amisub*, 879 F.2d at 799–801.

■■■ 57. Plaintiffs have also challenged the State's appeal process set forth in TN 88–8 as being contrary to federal law. Any prospective payment system must have an adequate appeals process to provide a means to remedy any rates which are not reasonable and adequate in a particular case. *Mary Washington Hospital*, 635 F.Supp. at 903.

■■■ 58. The State in this case has an appeals process but it is inadequate to ensure that economically and efficiently operated hospitals that receive inadequate reimbursement may seek relief. The State argues that the hospitals' right to appeal is unlimited, but a reading of the appeals provisions themselves cannot support this position. The appeals provisions, as described by the State in its letter to all hospitals, limit appeals to (1) errors in the hospital's 1985 Medicare cost report, (2) appeals related to a hospital's case mix

index or Medicaid cost apportionment, and (3) errors in rate computations. Additionally, hospitals may request a change to the capital component of their DRG formula price rate if they have been required to incur additional capital costs not otherwise reflected in their 1985 Medicare cost reports in order to maintain hospital licensing or Medicare or Medicaid certification. Certificate of Need approved capital changes are excluded from this appeals provision. The State does not permit hospitals to appeal the application of any of the other components in the rate setting methodology, such as the use of MPPUF, peer group placement, median capping of components, and capital freezing other than as specified in the Plan.

59. The inability of the hospitals to appeal the various components of their rates is particularly troubling in view of the State's choice of the MPPUF as an inflator from 1985 onward. The Court understands the State's desire to reign in hospital inflation and provide incentives for cost containment, but the State's long range use of the MPPUF does not accommodate the possibility that increases beyond the MPPUF may be justified by technological advances, enhanced professional standards, or new and necessary services that increase the cost of efficiently providing quality care. *Id.* at 901.

60. The Court holds that the appeals provision in Washington's second generation DRG system is unreasonably and arbitrarily narrow and contrary to federal law. The State is ordered to devise an appeals process which "complements its rate setting system by allowing hospitals to raise potentially relevant special factors without opening itself up to frivolous appeals." *Id.*

■■■ 61. The Court holds that the State is obligated under the Boren Amendment and implementing regulations to make disproportionate share payments to border hospitals. The State's failure to do so was arbitrary and capricious and contrary to law. *West Virginia University Hospitals v. Casey*, 701 F.Supp. 496 (M.D.Pa.1988), *aff'd in part and rev'd in part on other grounds*, 885 F.2d 11 (3rd Cir.1989).

**1402**

62. In sum, the Court declares that the Washington second generation Medicaid system adopted April 1, 1988 under TN 88–8, as amended in TN 88–11, TN 89–14 and TN 89–17, violates the procedural and substantive requirements of the federal Medicaid Act and its implementing regulations. The Court further holds that the State's findings and assurances to HCFA lacked any reasonable basis and, as such, were arbitrary and capricious and contrary to law. The Court holds that the appeals provisions for the Washington Medicaid program are unreasonable and arbitrarily narrow, and contrary to law. Finally, the State's failure to allow for disproportionate share payments to border hospitals was also arbitrary and capricious and contrary to law.

63. Judgment should be entered in favor of plaintiffs and against the State of Washington, the Department of Social and Health Services and Richard Thompson, the Secretary of DSHS, in accordance with this opinion. Judgment should be entered enjoining the State of Washington from giving further effect to the existing Medicaid reimbursement system in the State of Washington. Plaintiffs' counsel are directed to serve and file a proposed judgment with the Court within ten (10) days in accordance with these Findings of Fact and Conclusions of Law. Defendants may file any objections to the proposed judgment within ten (10) days of the filing of the proposed judgment. Plaintiffs shall be entitled to taxable costs to be assessed against the State Defendants.